STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK ROMEO, DEFENDANT-APPELLANT.

Argued May 18 and 19, 1964—Decided August 6, 1964.

Mr. *Thomas E. Durkin, Jr.* argued the cause for defendant-appellant (*Mr. William J. Gearty,* on the brief).

Mr. *Peter Murray,* Assistant Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney; *Mr. Murray,* of counsel and on the brief).

The opinion of the court was delivered by

HALL, J. The defendant was convicted of bookmaking, *N. J. S.* 2A:112–3, by a jury in the Essex County Court. His appeal was certified on our own motion while pending unheard in the Appellate Division. Three principal grounds are urged for reversal: first, because of an abortive prior trial, the further prosecution in which he was convicted was barred under principles of double jeopardy; second, articles were introduced in evidence which were obtained by an unlawful search and seizure; and third, the State did not make out a *prima facie* case of bookmaking.

I.

The claim of double jeopardy is based on the State's refusal to continue the first trial with 11 jurors after the twelfth was necessarily removed from further participation during the course of the case. Our criminal practice rules provide, *R. R.* 3:7–1(b): "Juries shall be of 12 persons but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12, except in murder cases."

The situation developed in this fashion. On the selection of the jury at the opening of the first trial, each juror was asked whether he knew defendant and none acknowledged any acquaintance. The opening statements of counsel and the complete testimony of the first two witnesses for the prosecution occupied the balance of the day. When the judge recessed for the day, he instructed the jury not to speak to anyone

concerning the case. The next morning, before the trial resumed, one of the jurors advised the judge privately that he had asked his wife and his brother-in-law the preceding evening whether he knew defendant. The inquiry disclosed that, while the juror was not personally acquainted with defendant, the brother-in-law was and all three were members of a local social organization. The juror was then examined on supplemental *voir dire* by the judge and both counsel out of the presence of the balance of the jury. It was clear therefrom not only that the juror had disobeyed the court's admonition against talking about the case, but, more important, that he could not fairly sit on the case as an impartial juror because of what he had learned the previous night. It is also evident that the situation was not brought about by any conduct of either the State or the defense, and there has been no explicit claim that the remainder of the jurymen might have been contaminated by the examined juror's bias.

The prosecutor then suggested that the judge declare a mistrial on his own motion. (As we view it, it would make no difference, under the circumstances, had the State actually made the motion.) The court responded that he found it necessary to excuse the juror from further service in the case and consequently felt "an absolute necessity" to declare a mistrial. He expressed the hope, however, that the prosecution would continue the trial with 11 jurors (no alternate jurors had been impaneled pursuant to *R. R.* 3:7–2(d)), to which defendant was agreeable. The State declined to consent, relying on *R. R.* 3:7–1(b), but assigned no reason for its refusal.[1]

---

[1] *The State does not contradict defendant's intimation that it was not elated with the way its case was going in at the time the juror's bias was discovered. We take it that agents of the Intelligence Division, Internal Revenue Service, United States Treasury Department, upon whose testimony the case against defendant had to rest as will later appear, were having difficulty in recalling complete details of the raid they conducted almost four years earlier during which defendant was arrested. This was not suggested to the trial judge and there is not the slightest thought he had it in mind in his ultimate declaration of a mistrial.*

The defendant did not quarrel with the discharge of the juror, but objected to the declaration of a mistrial when he and the court were willing to proceed with the remaining jurors. The judge denied his application for continuing the trial without the State's consent and terminated the trial.

Before the case was set for retrial defendant moved, pursuant to the requirement of *R. R.* 3:5-5(b)(2), *State v. Currie*, 41 *N. J.* 531, 535 (1964), for the entry of a judgment of acquittal. He claimed, as he does here, that the State may not refuse to continue a trial with less than 12 jurors except for "a legally sufficient reason," that no such reason was present and that consequently the mistrial was equivalent to an acquittal and another trial would subject him to double jeopardy. The court denied the motion holding that the State is entitled to withhold its consent under *R. R.* 3:7-1(b) as it sees fit, without effect upon the right to retry a defendant. 74 *N. J. Super.* 520 (*Cty. Ct.* 1962), commented on in 17 *Rutgers L. Rev.* 218 (1962).

The law in this State is thoroughly established that, while the principles of double jeopardy may be applicable to bar a second trial where the first has been terminated short of verdict, yet "* * * if the trial was terminated or the jury discharged before verdict because of incapacitating illness of the judge or a juror or jurors or of the defendant, or misconduct or disqualification of some members of the jury, or on account of an untoward incident that renders a verdict impossible, or some undesigned matter of absolute necessity, or the failure of the jury to agree upon a verdict after a reasonable time for deliberation has been allowed, subsequent prosecution for the offense [is] not barred," for reasons of justice and the public interest. *State v. Williams*, 30 *N. J.* 105, 121 (1959); *State v. Locklear*, 16 *N. J.* 232 (1954); *State v. Preto*, 51 *N. J. Super.* 175 (*Law Div.* 1958); *State v. Block*, 119 *N. J. L.* 277 (*Sup. Ct.* 1938), affirmed 121 *N. J. L.* 73 (*E. & A.* 1938); *State v. Van Ness*, 82 *N. J. L.* 181 (*Sup. Ct.* 1912), affirmed o. b. 83 *N. J. L.* 801 (*E. & A.* 1912); *State v. Hall*, 9 *N. J. L.* 256 (*Sup. Ct.* 1827). While we insist

that the abortive termination be for a "sufficient legal reason" and "an absolute or an overriding necessity," *State v. Locklear, supra* (16 *N. J.,* at *p.* 243), and carefully review the trial court's action to be certain that these requirements are fairly met, *State v. Locklear, supra, State v. Preto, supra,* there has never been any doubt that these criteria are met and another trial is not barred where the mistrial is occasioned by the necessary disqualification of a juror for bias. The defendant concedes this to be so and further agrees that the trial court here acted entirely properly in excusing the juror in question.

Perhaps it should be mentioned that the law of New Jersey concerning the effect of trial termination before verdict is at least as stringent in a defendant's favor as that of the federal courts acting under the Fifth Amendment. See 9 *Rutgers L. Rev.* 581, 584 (1955), commenting upon *Locklear;* Note, "Double Jeopardy: The Reprosecution Problem," 77 *Harv. L. Rev.* 1272 (1964); and Annotation, "Double jeopardy after declaration of mistrial or discharge of jury in federal court," 6 *L. Ed.* 2d 1510 (1962). So if the Fifth Amendment is in this respect applicable to the states by virtue of the Fourteenth Amendment, *cf. Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653 (1964), our decisions would be in line with federal law. (And our requirements certainly go beyond those imposed by the concept of due process under the Fourteenth Amendment alone. See *e. g., Brock v. North Carolina,* 344 *U. S.* 424, 73 *S. Ct.* 349, 97 *L. Ed.* 456 (1953).)

Indeed the criteria just referred to as announced in *Locklear, supra* (16 *N. J.* 232), were expressly based upon the principles laid down by Mr. Justice Story in the leading case of *United States v. Perez,* 9 *Wheat.* 579, 580, 6 *L. Ed.* 165 (1824):

"We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to

exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner."

Consonant therewith, the federal courts have uniformly held since *United States v. Simmons,* 142 *U. S.* 148, 12 *S. Ct.* 171, 35 *L. Ed.* 968 (1891), that a biased juror necessitates a mistrial which does not bar another trial. Mr. Justice Gray there put it this way:

"There can be no condition of things in which the necessity for the exercise of this power is more manifest, in order to prevent the defeat of the ends of public justice, than when it is made to appear to the court that, either by reason of facts existing when the jurors were sworn, but not then disclosed or known to the court, or by reason of outside influences brought to bear on the jury pending the trial, the jurors or any of them are subject to such bias or prejudice as not to stand impartial between the government and the accused." (142 *U. S.*, at *p.* 154, 12 *S. Ct.*, at *p.* 172, 35 *L. Ed.*, at *p.* 971)

See also *Thompson v. United States,* 155 *U. S.* 271, 15 *S. Ct.* 73, 39 *L. Ed.* 146 (1894).

We do not conceive that any doubt has been thrown on the strength of this view by recent decisions of the United States Supreme Court in less compelling situations. In these cases the court has reached differing results on close votes, the cases turning on varying views as to the necessity of discharge of the jury and the weight to be given to the trial court's exercise of discretion under the particular circumstances. Compare *Wade v. Hunter,* 336 *U. S.* 684, 69 *S. Ct.* 834, 93 *L. Ed.* 974 (1949) (termination of military court martial because of army advance on European battlefronts held no bar to further proceedings), and *Gori v. United States,* 367 *U. S.* 364, 81 *S. Ct.* 1523, 6 *L. Ed. 2d* 901 (1961) (declaration of mistrial felt necessary by trial judge to protect defendant from prejudicial testimony held no bar to a subsequent trial), with *Downum v. United States,* 372 *U. S.* 734, 83 *S. Ct.* 1033, 10

*L. Ed.* 2*d* 100 (1963) (declaration of mistrial at government request because believed essential witness was not available to testify held to bar further trial). But *cf. United States v. Tateo,* 84 *S. Ct.* 1587, 12 *L. Ed.* 2*d* 448 (1964) (coerced guilty plea by trial judge during trial held not a bar to a new trial after plea had been set aside).

█ We see nothing in *Locklear* or *Downum,* relied upon by defendant. indicating that the "absolute necessity" concept requires the State to assign "a legally sufficient reason" before it may refuse to consent to continue a trial with less than 12 jurors.

█ He argues principally that *R. R.* 3 :7–1(b) was promulgated to extend "the guarantee against double jeopardy to those situations where 1 or more jurors becomes disqualified or incapacitated." It is clear beyond dispute that it was adopted for another and quite different purpose and had no intended connection with the double jeopardy concept. *R. R.* 3 :7–1(a), permitting a criminal trial without a jury if the defendant waives the right with the approval of the court and consent of the State,[2] and (b), originally Rules 2 :7–1(a) and (b), were essentially copied from *Federal Rule of Criminal Procedure* 23(a) and (b), except that we excluded murder causes from their permissive operation. The purpose of subdivision (b) is shown by the comment thereto in Tentative Draft of the Rules Governing the Courts of New Jersey (1948), *p.* 55, which again was derived from substantially identical language in the Notes of the Advisory Committee on the federal rules, 18 *U. S. C. A., Rules of Criminal Procedure, Rule* 23, *p.* 429. Our comment read as follows:

---

[2] Since this is not a case where defendant sought to waive a jury over the objection of the State before the trial commenced, we are not concerned with any possible claims of constitutional invalidity of Federal Rule 23(a) or *R. R.* 3 :7–1(a) in such a situation. To date the requirement of consent by the prosecution has been generally considered a valid one. See, *e. g., Singer v. United States,* 326 *F.* 2*d* 132 (9 *Cir.* 1964), *cert.* granted 84 *S. Ct.* 1168 (1964) ; Annotation, "Right of accused to insist, over objection of prosecution or court, upon trial by court without a jury," 51 *A. L. R.* 2*d* 1346 (1957).

"This is based upon Federal Rule 23(b). There is no statutory law on the subject in New Jersey. It is a well-settled common law rule that a party in a cause may waive rights which the law has given him, even constitutional rights. (See Bishop's New Criminal Law, Vol. 1, sec. 995.) This rule would permit either a stipulation before the trial that the case be tried by a jury composed of less than 12, or a stipulation during the trial consenting that the case be submitted to less than 12 jurors. The second alternative is useful in case it becomes necessary during the trial to excuse a juror owing to illness or for some other cause and no alternative juror is available. The constitutionality of this rule was approved in the Federal Courts in Patton v. United States, 281 U. S. 276, 50 S. Ct. 253, 74 L. Ed. 854, 70 A. L. R. 263."

Prior to *Patton v. United States*, 281 *U. S.* 276, 50 *S. Ct.* 253, 74 *L. Ed.* 854 (1930), there was a difference of view in the federal courts, which likewise existed between various state courts, as to whether a defendant and the prosecution could constitutionally agree to continue a trial with less than 12 jurors and whether a court had jurisdiction to proceed with the case under such an agreement. The decision settled the questions affirmatively for the federal courts, at the same time upholding the right of the parties and the court, by consent, to try the case without a jury at all. *Federal Rule* 23(a) and (b) was therefore a restatement of existing valid practice. As far as we can discover, it has never been referred to in connection with the matter of double jeopardy.

New Jersey had held, at least for almost a half century before *Patton*, that the right to trial by jury could be waived with the consent of the State, *Edwards v. State*, 45 *N. J. L.* 419 (*Sup. Ct.* 1883); see also *State v. Stevens*, 84 *N. J. L.* 561 (*Sup. Ct.* 1913), and *State v. Ciniglio*, 57 *N. J. Super.* 399 (*App. Div.* 1959), except in murder causes, *In re Tremper*, 129 *N. J. Eq.* 274 (*E. & A.* 1941). So *R. R.* 3:7–1(a) was only an express statement of existing law and paragraph (b) merely made certain the corollary that a trial could proceed with less than 12 jurors upon the consent of the parties and the court. It will be noted that both *R. R.* 3:7–1(b) and the federal counterpart are entirely permissive and impose no conditions or restrictions on the giving or

withholding of the requisite agreement. There is clearly no intent that either the State or the court must give some valid reason for withholding approval. It is a rule of permissive expediency rather than of compulsory principle. .

 Defendant has not cited any authority that any similar rule or analogous common law principle has been construed to apply in a double jeopardy situation as he urges. The only authority we have been able to locate holds to the contrary. *Armor v. State*, 125 *Ga.* 3, 53 *S. E.* 815 (*Sup. Ct.* 1906); cf. *Gardes v. United States*, 87 *F.* 172 (5 *Cir.* 1898), *cert.* denied 171 *U. S.* 689, 19 *S. Ct.* 884, 43 *L. Ed.* 1179 (1898); 22 *C. J. S. Criminal Law* § 259, *pp.* 677–678. It is certainly risky business, from the standpoint of the public interest, for a prosecutor to agree to proceed with 11 jurors when it has been established that the twelfth has developed a bias against the State, even where there is no evidence that the bias had actually been expressed to the remaining jurors. He should not, in effect, be compelled to proceed unless he can positively prove infection—a fact frequently difficult to establish. It is much more salutary to remove all possible taint by declaring a mistrial and the accused cannot soundly be heard to say that he should not be tried again. We conclude that defendant's first point is without merit.

## II.

Defendant's contention that items admitted in evidence were obtained by illegal search and seizure revolves around a rather unusual situation, both factually and procedurally. The State's case against him rested almost completely upon the articles in question. One was a packet which its witnesses said defendant tossed away during a raid on a candy store in Newark the late afternoon of November 13, 1958. The package was wrapped in an "Armstrong daily," secured by rubber bands, and contained what an expert witness testified were betting slips and a bookmaker's account sheets referring to horse race bets on that date. The other items, marked as three separate exhibits, said to have been found in defendant's

wallet, were identified as, respectively, bookmaker's account sheets for the previous day and a date some months earlier having some names in common with the writings in the package, a betting slip referring to races on November 13, and a sheet listing the odds on certain baseball games (undated and apparently of little direct import in the case).

The raid was made by agents of the Intelligence Division, Internal Revenue Service, United States Treasury Department, under a federal search warrant, issued the previous day, authorizing search of the premises for records, paraphernalia, etc., asserted to have been or being used in violation of federal statutes requiring the payment of an excise tax on wagers by any person engaged in the business of accepting wagers and making it a criminal offense for willful failure so to do. 26 *U. S. C. A.* §§ 4401, 4411, 4412, 7203 and 7262. There is no contention that the warrant was not proper or that the affidavit upon which it was based did not adequately establish probable cause for its issuance under federal law. Defendant was arrested in the course of the raid, apparently on a charge of violation of one or more of the cited sections. We do not know the outcome of any such federal charge, but there is no indication of any application's having been made in the federal court to suppress the evidence now objected to.

The present indictment in the state court against defendant for bookmaking was not returned until February 1961 and he made no motion to suppress the articles at any time thereafter. (*R. R.* 3:2A–6 requiring a motion to suppress on the ground of unlawful obtaining of the evidence to be made before trial, unless it could not reasonably have been so made, on pain of waiver of any such objection to admissibility at the trial was not adopted until after this trial took place.) The contention of illegal search and seizure was not made until the State offered the articles in evidence following the testimony of four federal agents concerning the circumstances of the raid (which for the most part was limited to that which concerned the defendant), the discovery of the items and

defendant's connection with them. Defendant then objected to their admission on the ground that they had been unlawfully obtained and the trial court overruled the objection after extensive legal argument.

We think it fair to say in this connection that the State's proofs with respect to admissibility were directed primarily to the relation of the articles to the defendant rather than to the matter of the legality of the means by which they were obtained. However, defendant had the burden of establishing illegality. *Addison v. United States,* 317 *F.* 2d 808, 812 (5 *Cir.* 1963), *cert.* denied 376 *U. S.* 905, 84 *S. Ct.* 658, 11 *L. Ed.* 2d 605 (1964); *Chin Kay v. United States,* 311 *F.* 2d 317, 321 (9 *Cir.* 1962). Neither party sought to offer any further proofs to the judge on that subject, as they might have. Defendant was apparently satisfied to rest his claim on what he contended to be fatal weaknesses in the State's position disclosed by its testimony as it stood at the time of the objection, which is, of course, the status with respect to which admissibility is to be tested. In view of the parties' approach, we feel that the question may be reviewed and can properly be determined on the same basis, despite the somewhat scanty and unoriented record, but considering additionally the warrant, the affidavit upon which it was issued and related papers along with certain other facts stated by counsel in argument though not testified to by the witnesses. It is obvious from the record of the argument on admissibility that both defendant's counsel and the prosecutor had knowledge of the contents of the warrant papers and directed their arguments in the light thereof, even though they were not furnished to the trial judge as they have been to us. Our determination must be made in accordance with federal law. *Aguilar v. Texas,* 84 *S. Ct.* 1509, 12 *L. Ed.* 2d 723 (1964). This is especially so because this search and seizure was by federal officers under a federal warrant. *Cf. Rea v. United States,* 350 *U. S.* 214, 76 *S. Ct.* 292, 100 *L. Ed.* 233 (1956).

The circumstances of the obtaining of the evidence in question, as shown by the State's testimony at the time of the offer

supplemented as indicated above, may be fairly summarized as follows:

According to the affidavit, which makes the agents' testimony meaningful on the issue before us, surveillance of the premises for some time prior to the raid disclosed that a gambling operation was being quite opening conducted. The store was frequented by adults, not children. Lottery bets were made there with defendant's brother Joseph, who appeared to operate the store, the latter's wife Irene, another brother Ralph and "a white individual about 45 years of age, believed to be one of Joseph Romeo's brothers." Known "runners" regularly entered the store and deposited small paper bags on the counters. Large numbers of betting slips were seen about the premises. Almost daily, at about the time of the raid, Joseph Romeo left the premises in a car driven by a man named Pecararo, carrying a large paper bag which appeared fully stuffed and light in weight. Joseph and Ralph Romeo and Pecararo had criminal records on gambling charges.

The raid was conducted by a considerable number of agents, there was a goodly crowd in the store and confusion reigned. Apparently the agents had federal arrest warrants at least for Joseph, Irene and Ralph Romeo and Pecararo and a particular agent had been assigned to the arrest of each of these persons. Some resistance was encountered in making the arrests. Search of the premises disclosed a large quantity of betting slips and other gambling material. It may have been that a "John Doe warrant" had been issued in addition for the arrest of the "white individual * * * believed to be one of Joseph Romeo's brothers," and that the person intended thereby was the defendant, but we will assume that there was no valid warrant for his arrest.

The judge could fairly find from the testimony of the agents that immediately on entering the store, one approached defendant, who was standing in the public portion of the store, wearing an overcoat. He asked his name and when the reply was "Frank Romeo," the agent "immediately * * * placed him under arrest and advised him of his constitutional

rights." (We further assume that at that moment there was no right to arrest without a warrant since the only federal offenses which appear to have been involved carried a punishment of imprisonment for *not more* than one year and were thus misdemeanors in the arrest sense for which an arrest can only be made when the offense is committed in the presence of the officer. See *State v. Doyle,* 42 *N. J.* 334, 345–349 (1964) ; 18 *U. S. C. A.* § 1.) This agent then momentarily turned to close a door and defendant was observed by another officer reaching into his left side pocket and extracting papers or a packet, which he dropped or threw toward the wall. A third agent went to the spot and found the previously referred to package, which he handed to the first officer. Upon .noting its general nature, he directed defendant to empty his pockets and place the contents on a stool, which he did. Included was his wallet. The packet and the articles from his person were placed in a sealed envelope and defendant was taken to the headquarters of the Intelligence Division where the items were fully examined during interrogation of the defendant. It was then that the papers admitted in evidence were found in the wallet. Defendant denied ownership of the package.[3]

Were it not for the words of the agent announcing, when he first encountered defendant in the store, that he was placing him under arrest, there could be no possible question of the legality of the seizure of the packet. The agents were upon

---

[3] Defendant testified on his own case at the trial, after the articles in question had been admitted in evidence, that, while he saw the package on the floor at the time of the raid, he had not previously had it in his possession and that it belonged to his brother Ralph, who had died since the raid. He denied the sheets testified to having been found in his wallet were his or that he had ever seen them before. The betting slip he conceded to be his, but he said it was a memorandum of horse race bets he had intended to place himself with a downtown bookmaker earlier that day, but had not done so. He further said, although his testimony was not clear, that he had stopped in the store, on his way to duty as a city fireman, just a few minutes before the raid, either to make a personal purchase or to collect rents from occupants of the building owned by a corporation in which he had interest. This testimony, of course, bore not on admissibility but was for the jury's consideration on the issue of guilt.

the premises under a valid search warrant and were legally entitled to seize all gambling paraphernalia found thereon. Defendant argues in substance, however, that the original action of the agent constituted an arrest which was illegal because there was no arrest warrant and no misdemeanor was committed in his presence at that time, and that all the evidence which was the fruit of it, including the packet as well as the papers subsequently found in the wallet, was unlawfully obtained and so inadmissible. *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed. 2d* 441 (1963); *Henry v. United States,* 361 *U. S.* 98, 80 *S. Ct.* 168, 4 *L. Ed. 2d* 134 (1959); *State v. DeGrazio,* 39 *N. J.* 268 (1963).

 But we do not think the action of the agent when he first met up with defendant should be characterized as such an arrest in the context of the circumstances. It must be presumed that the raiding agents were familiar with the information obtained by the prior surveillance of the premises—that a gambling operation was being rather openly conducted in the store and that the store was run by Joseph Romeo and bets taken therein by him and other members of the family bearing that name, including a brother whose first name had not been secured. When the agent asked defendant his name and was told it was "Frank Romeo," he must have realized that he was not dealing with a mere stranger-customer in the store, but a member of the involved family and possibly one active in the gambling enterprise. While the search warrant perhaps did not vest a right to search everyone who might be in the public portion of the store, *United States v. DiRe,* 332 *U. S.* 581, 68 *S. Ct.* 222, 92 *L. Ed.* 210 (1947), and might not permit even the temporary detention until the raid and search were completed of every individual present at the time of execution of the warrant, matters which we need not pass upon, in the circumstances here the raiding officer was justified in requiring the defendant at least not to leave or move until it could be ascertained that he was not engaged in removing or secreting property specified in the warrant or involved in the criminal business. See *United States v. Festa,*

192 *F. Supp.* 160, 163 (*D. Mass.* 1960); cf. *United States v. Viale,* 312 *F. 2d* 595 (2 *Cir.* 1963), *cert.* denied 373 *U. S.* 903, 83 *S. Ct.* 1291, 10 *L. Ed. 2d* 199 (1963); *Wyche v. United States,* 193 *F. 2d* 703 (*D. C. Cir.* 1951), *cert.* denied 342 *U. S.* 943, 72 *S. Ct.* 556, 96 *L. Ed.* 702 (1952). We therefore conclude that, despite the formal language of arrest used by the agent, his action should not be legally characterized as such in the usual sense, cf. *State v. Doyle, supra* (42 *N. J.,* at *p.* 342), but rather considered simply as a justifiable temporary detention of this defendant during the raid. Courts ought not to insist that policemen act on necessary spurs of the moment with all the knowledge and acuity of constitutional lawyers. The fundamental requirement of the Fourth Amendment is reasonableness. Granting requisite adherence to the basic essentials of that concept assuring proper recognition of the individual liberties sought to be safeguarded thereby, the validity of law enforcement conduct should not be judicially tested by *post facto* technicalities and formalisms of no vital importance. *Cf. R. R.* 3 :2A–6(b). So the packet tossed away by him almost immediately thereafter was not the fruit of an illegal arrest and not barred from admission in evidence on that ground.

When the officer saw defendant discard the package and the nature of its contents was revealed after its recovery, defendant had given evidence, *prima facie* sufficient, of his commission of a misdemeanor under the federal Wagering Tax Act in the presence of the officer to warrant his arrest at that moment without a warrant. *Cf. Robinson v. United States,* 325 *F. 2d* 880 (5 *Cir.* 1964). It is elementary that in such event "a search of his person or of the things within his immediate possession or control, or of the place of arrest to the extent that it is within his immediate possession or control, is considered incidental to the arrest" and valid. *State v. Doyle, supra* (42 *N. J.,* at *p.* 344), and federal cases cited therein. Consequently the papers from defendant's wallet, as well as the package of gambling slips and records, were lawfully seized and properly admitted in evidence.

### III.

█ We are not impressed with defendant's contention that the State failed to make out a *prima facie* case of bookmaking in violation of *N. J. S.* 2A:112-3. The crime is the making or taking and recording or registering of bets or wagers on races and kindred contests. *State v. Morano*, 134 *N. J. L.* 295 (*E. & A.* 1946). Courts have soundly recognized that the business is carried on cautiously and furtively and in as many different ways and by as many conceivable methods as human ingenuity can devise in order to escape detection and criminal consequences and will be "* * * alert to avoid the frustration of bookmaking prosecutions legitimately based on inferences which may reasonably be drawn from furtive conduct and scanty records." *State v. Fiorello*, 36 *N. J.* 80, 92 (1961); see *State v. Kuznilz*, 36 *N. J. Super.* 521, 530 (*App. Div.*), certif. denied 20 *N. J.* 136 (1955).

█ Here we are convinced of the sufficiency of the prosecution's evidence to defeat a motion for acquittal at the end of its case in the light of the elementary rule that the State is "entitled to the benefit of all of its favorable testimony and the favorable inferences which a jury might reasonably draw therefrom." *State v. Fiorello, supra* (36 *N. J.*, at *p.* 87). Although no two cases in this field are ever factually alike, the State's proofs here fell within the broad requisites laid down in our leading cases. *State v. Morano, supra* (134 *N. J. L.* 295); *State v. Lennon*, 3 *N. J.* 337 (1949); *State v. Rhams*, 14 *N. J.* 282 (1954); *State v. Hozer*, 19 *N. J.* 301 (1955); *State v. Fiorello, supra* (36 *N. J.* 80); *State v. Kuznitz, supra* (36 *N. J. Super.* 521). The salient points of the prosecution evidence previously outlined — defendant's possession of betting slips and account sheets in the package and in his wallet which the undisputed expert testimony showed could only be records kept by a bookmaker (even though it was not demonstrated that all were in his handwriting) and his effort to divest himself of some of them during the raid—were enough legitimately to permit an inference

by the jury that defendant participated in bookmaking on the day of the raid as charged in the indictment.

While the State's proofs were of the nature that the incriminating inference might well be successfully overcome on defendant's case if that inference were not a true one, his proofs in attempted explanation and rebuttal (see footnote 3, *supra*, in addition to which there was other testimony which need not be recounted in detail) were such that a jury could readily find them completely incredible, and thus did nothing to weaken the State's case. See *State v. Fiorello, supra* (36 *N. J.*, at *p.* 92). This observation disposes of defendant's further argument that the verdict was against the weight of the evidence. The requisite clear and convincing appearance that it was the result of mistake, partiality, prejudice or passion, *R. R.* 1:5–1(a), does not exist.

We should also add that we can perceive no merit whatever in the additional point that a statement of the trial judge in the course of the trial was so prejudicial as to have dictated the granting of a mistrial, defendant's motion for which was denied. We see nothing improper in the statement referred to.

The judgment is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.