UNITED STATES of America, Appellee,

v.

Raymond VARGAS, Defendant–Appellant.

UNITED STATES of America, Appellee,

v.

Orlando RODRIGUEZ,
Defendant–Appellant.

Nos. 79–1603, 79–1604.

United States Court of Appeals,
First Circuit.

Argued June 4, 1980.

Decided Sept. 24, 1980.

Hector A. deJesus, Everett, Mass., by appointment of the Court, for defendant–appellant, Raymond Vargas.

Roxana I. Marchosky, Boston, Mass., by appointment of the Court, for defendant–appellant, Orlando Rodriguez.

Judd J. Carhart, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., and Janis M. Berry, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Following a three–day trial in the District Court for the District of Massachusetts, appellants Orlando Rodriguez and Raymond Vargas were convicted under 21 U.S.C. §§ 841(a)(1) and 846 of conspiracy to possess quantities of cocaine and heroin with intent to distribute. On appeal, they each allege that the trial judge erred in (1) refusing to suppress certain evidence seized in the course of their warrantless arrest and (2) denying their respective motions for judgment of acquittal. Rodriguez also challenges the court's refusal to suppress various items recovered from a motel room upon execution of a search warrant.

I.

The case revolves around the activities of four individuals: Jorge Crespo, Armando Diaz, and the two appellants.[1] The Drug Enforcement Administration (DEA) already had information concerning three of these individuals prior to the events in question. Two informants had reported to the DEA that Crespo and Diaz were major narcotics traffickers from New York, and that Crespo travelled to Boston almost weekly carrying large amounts of cocaine and heroin. Previous DEA investigation had revealed that Crespo often stayed in Boston at the 1200 Beacon Street Motel–a location known to the DEA, from its own experience and from Brookline Police reports, as an occasional drug distribution point. In addition, the DEA had learned from an assistant district attorney in New York that Crespo had three cases pending there involving the sale of cocaine, that Diaz served as Crespo's bodyguard during drug transactions, and that Diaz himself had been arrested in New York for narcotics violations.[2] Rodriguez was also well known to the DEA. Four corroborated sources had reported that Rodriguez was a major cocaine and heroin trafficker in the Boston area and that Crespo and Diaz were his suppliers. DEA agents had stopped Rodriguez and searched his car on a previous occasion, but had uncovered no evidence of unlawful conduct.

On August 2, 1979, Special Agent Boeri received a call from a reliable informant

1. Crespo and Diaz were indicted on the conspiracy counts and, in addition, were charged with actual possession of cocaine and heroin with intent to distribute. The record states that Crespo "defaulted" prior to trial without any explanation of what constituted the default. Diaz was convicted on all four counts but has not joined in the present appeal.

2. In fact, Diaz had been arrested for firearms, not narcotics, violations.

who reported that Crespo and Diaz were in Boston to meet with several major narcotic traffickers from the local area. Despite the informant's failure to disclose the location of the meeting or the identity of the other participants, Special Agent Keaney suspected, in light of the DEA's prior information, that the meeting would occur at the 1200 Beacon Street Motel and that Rodriguez would attend. After learning from a telephone call to the motel that Crespo had checked into room 126 at 11:00 the previous evening, Keaney initiated surveillance of the room at approximately 12:30 that afternoon.

Agent Simpkins, disguised as a motel employee, went to room 126 for the ostensible purpose of collecting the day's rent. Appellant Vargas answered the door, gave Simpkins the rent and a tip, and received a receipt. The lights in the room were off and the shades were drawn. While standing in the doorway, Simpkins saw nobody else in the room and no signs of criminal activity. Thereafter, the agents observed someone, whom they could not identify, intermittently draw back the window shades partway and peer out.

At approximately 2:00 P.M., Rodriguez and Diaz arrived at the motel in Rodriguez's car. They proceeded directly to room 126, which adjoins a balcony facing the street, without passing through the motel lobby. Rodriguez knocked on the door, but then immediately went to a phone booth where he appeared to place a short call. With Diaz waiting at the door to room 126, Rodriguez returned to his car and extracted from the trunk a white bag containing a long, box–shaped object. Carrying the bag with two hands, Rodriguez then rejoined Diaz and entered the room. Several minutes later, Vargas stepped outside, scanned the street momentarily, and walked out of the agents' view. He returned shortly and reentered room 126 carrying an orange cylindrical object which the agents could not then identify.

Approximately twenty–five minutes after Rodriguez and Diaz had arrived, Rodriguez and Vargas exited room 126 and walked to Rodriguez's car. Rodriguez crumpled up the white bag, now apparently empty, and discarded it. As he approached the car, he also appeared to tuck something under his shirt. Rodriguez and Vargas drove away, and three agents in two cars followed. During the course of this "moving surveillance," Vargas several times turned around and peered out the rear window. At one point, Vargas looked backwards directly at the pursuing agents. Almost simultaneously, the vehicle veered sharply to the right around another car and then back into the left lane, increasing its speed slightly. Rodriguez's vehicle was then travelling 30–45 miles per hour and was not in violation of any traffic laws. Nonetheless, the agents decided to stop it, believing that Vargas had recognized them, that Rodriguez was attempting to elude them, and that–based on their earlier observations–the two were probably in possession of narcotics. In the course of ordering the appellants out of the vehicle and placing them under arrest, the agents observed on a shelf beneath the glove compartment three packages of mannite–a commercially available laxative commonly used as a cutting agent for heroin and cocaine–and several small amber bottles of a type frequently used to carry those drugs. After being read the *Miranda* rights, Rodriguez volunteered that he owned the car but denied ownership of the mannite and amber bottles. A pat–down search of both appellants revealed no drugs or weapons; Vargas, however, had a key to room 126 in his pocket. Rodriguez consented to a search of the vehicle's trunk, which was found to contain a shoulder holster, a bullet–proof vest, and a "dent puller."[3] Upon discovering these items, the agents subjected the appellants to a partial strip search which uncovered nothing further.

Meanwhile, surveillance at the motel had continued. Approximately ten minutes af-

---

**3.** At trial, the items found in the vehicle's trunk were excluded from evidence out of concern for their prejudicial impact. There was no explanation of "dent puller."

ter Rodriguez and Vargas had departed, Crespo and Diaz stepped out onto the balcony and scanned the street. Crespo walked to the parking lot behind the motel and returned with a small white box which he handed to Diaz. After again looking about intently, they reentered the room separately. The agents then gained access to room 125, adjacent to the one under surveillance, and with their front door slightly ajar overheard whistling, men talking in a foreign language, and a metallic clanking sound. Agent Vinton attributed the latter to a triple beam balance scale, based on his experience, as a narcotics agent, with some two dozen such devices.

At approximately 4:30 P.M., Crespo and Diaz walked out onto the balcony and were immediately arrested. In the course of securing the room pending issuance of a search warrant, Agent Vinton spotted a triple beam balance scale in its box on the floor. Crespo was found to have the rent payment receipt that had earlier been given by Agent Simpkins to Vargas. The subsequent search of the room, conducted at approximately 9:30 that evening, uncovered the following items: 693 grams of cocaine, 43 grams of heroin, $8,900 in cash, a triple beam balance scale resting in an open box, an orange hydraulic pump, a large bag of lactose, and a small, empty white box with the word "lactose" written on its label. Lactose is a common cutting agent for heroin and cocaine. A hydraulic pump of the type seized is frequently employed to compress cocaine to make it appear of higher quality. The pump was missing a small component, and there was conflicting testimony at trial as to whether it was operable in that condition; in any event, none of the cocaine recovered had been compressed. Most of the cocaine was fifty percent pure and a small portion of it was seventy-five percent pure. Since cocaine sold on the streets is typically only fifteen percent pure, and given the large amount of lactose seized, the agents inferred at trial that they had interrupted Crespo and Diaz before the cutting process had been completed.

Finally, the white paper bag which Rodriguez had discarded was recovered and found to contain pieces of cardboard. Agent Keaney reconstructed the cardboard pieces and found that they formed the packaging material for the type of triple beam balance scale seized in the motel room.

## II.

■ Based on the evidence presented at the suppression hearing, the district court concluded that the DEA agents initially detained the appellants solely for the purpose of conducting an investigatory stop, and that the decision to arrest them was made only after the mannite and amber bottles were spotted in the car. Accordingly, in deciding whether those objects and the motel key found on Vargas should be suppressed, the court engaged in a two-step inquiry: it first analyzed the propriety of the stop under the "reasonable suspicion" test annunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and then determined whether the agents' prior information and observations, in conjunction with seeing the mannite and amber bottles, provided probable cause for the arrests. The appellants contend (1) that the court's finding of an investigatory stop "flies in the face of the facts on record" and, as a result, the mannite and amber bottles should have been excluded from the probable cause determination, and (2) that, even if those items are considered, the court's finding of probable cause was erroneous.

### A.

Our review of the entire record discloses a paucity of evidentiary support for the trial court's finding that an investigatory stop preceded the arrests. When the decision was made to stop the appellants, Agents Boeri and Simpkins pulled alongside their vehicle and motioned to them to pull over. Agent Vinton, in the second car, pulled up alongside the passenger side of Rodriguez's car so that the door could not be opened. From his seat, Vinton placed his badge against the window and instructed the appellants to put their hands up.

Agent Boeri then asked them to step out of the car and, within thirty seconds of the stop placed them under arrest. Although, curiously, the various agents were never directly questioned about their purpose in stopping the appellants, Boeri did express his belief that the vehicle contained narcotics–based on the report that Rodriguez had stuffed something under his shirt upon leaving the motel, the seemingly evasive driving pattern, and the prior surveillance in general. The only evidence suggesting that an investigatory stop was intended–and that the arrests were triggered by the objects spotted in the car–derives from Boeri's statements that he observed [4] and recognized [5] the mannite before advising the appellants they were under arrest. In subsequent testimony, however, Boeri indicated that the observation of the mannite and the arrest of the appellants–rather than being sequential events bearing a causal relationship–occurred simultaneously in a manner described as "all . . . in one motion." [6]

We need not decide, however, whether the trial court's finding was clearly erroneous. The appellants do not dispute, and we have no difficulty in concluding, that the agents had sufficient grounds to temporarily detain the appellants, at least for the purpose of questioning.[7] The activities observed at the motel and during the moving surveillance, when coupled with the agents' prior information,[8] constituted "specific and

---

**4.** Q. Now, the arrest, agent, to which you have previously testified, the arrest occurred after the defendant was extracted from the vehicle?

A. Yes, as we got them out of the car, yes, sir.

Q. Did you see that Mannite prior to telling the defendant [sic] they were under arrest?

A. Yes, sir, I did.

**5.** Q. And was that [mannite] readily recognizable to you as what you have testified to as a cutting agent?

A. I have seen the packages before. I knew what they were the minute I saw them.

**6.** Q. Now, at the time you stopped Mr. Rodriguez' car on Bynner Street or South Huntington–which street was it, by the way?

A. Bynner.

Q. Did you tell them at that time, immediately, that he [sic] was under arrest?

A. Yes, ma'am.

Q. And this was before you saw the Mannite and amber bottles?

A. It was all sort of in one motion. Advised him he was under arrest, to get out of the car, and at that time I was looking in the car and I saw the Mannite and bottles.

This latter testimony occurred at trial, and a question arises as to whether we may consider it in reviewing the denial of a motion to suppress. It apparently is settled law "that the validity of an arrest or search can be *supported* by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing." *United States v. Canieso*, 470 F.2d 1224, 1226 (2d Cir. 1972) (emphasis added)' *accord, United States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975). *Compare, e. g., Aguilar v. Texas*, 378 U.S. 108, 109, n. 1, 84

S.Ct. 1509, 1511, n. 1, 12 L.Ed.2d 723 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention.")

On the other hand, the use of trial testimony to *undermine* the validity of an arrest or search is apparently discouraged, at least when the motion to suppress has not been renewed and reconsidered during the course of the trial. *See* 3 W. LaFave, *Search and Seizure* § 11.7(c) (1978) and cases cited therein. If so, we would be compelled to overlook Boeri's trial testimony; Rodriguez's attorney did object to the introduction at trial of the mannite "on the prior grounds already argued to the Court," but even if this could be construed as a renewal of the motion to suppress, it occurred before Agent Boeri gave the testimony quoted above. In light of our disposition of the fourth amendment claim, however, we need not resolve this procedural issue, and we thus express no opinion with respect thereto.

**7.** We need not decide whether a frisk of the appellants would also have been appropriate at that time, since the pat–down search occurred subsequent to their arrest.

**8.** In *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), the Court indicated that an informant's tip which was inadequate to provide probable cause under *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), could nonetheless justify an investigatory stop if it carried sufficient "indicia of reliability." In the present case, as discussed *infra*, the informants who provided information as to the past activities and present reputations of the defendants and as to the events of Au-

articulable facts," *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879 warranting a reasonable suspicion that the four defendants were conspiring to possess narcotics with the intent to distribute. *See, e. g., United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–2581, 45 L.Ed.2d 607 (1975). In addition, the mode of restraint employed by the agents–involving the boxing–in of appellants' vehicle and the immediate command that their hands be raised–was not inconsistent with an investigatory stop, given their seemingly evasive driving pattern and the agents' interest in preserving evidence and ensuring their safety. *See, e. g., United States v. Worthington*, 544 F.2d 1275, 1280 n.3 (5th Cir.), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977); *United States v. Adams*, 484 F.2d 357, 358, 361 (7th Cir. 1973).[9] It follows that, regardless of the agents' subjective intention in initially stopping the vehicle, the detention comported fully with the fourth amendment in terms of the degree of intrusion visited upon the appellants–at least until they were formally placed under arrest.[10] By that time, however, the agents had observed the mannite and amber bottles located in plain view in the vehicle. Accordingly, even if the agents had subjectively decided to effect an arrest prior to observing those objects, we think the mannite and

amber bottles can appropriately be considered in determining whether there was probable cause to arrest–the issue to which we now turn. .

### B.

"Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959), *quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).[11] We focus first on the events of August 2, 1979. To recapitulate briefly: the DEA agents learned that Crespo had checked into room 126; Agent Simpkins in disguise gained entry to the darkened room but observed no signs of criminal activity; an unidentified individual was seen peering intermittently out the window; Rodriguez and Diaz arrived and proceeded directly to, but did not enter, room 126; after placing a brief phone call, Rodriguez removed a white bag containing a box–shaped object from his car and carried it into the room; Vargas, after scanning the street, left and shortly returned with an unidentified, orange cylindrical object; Rodriguez and Var-

gust 2, 1979, had all proven reliable in the past. Regardless of whether their information, by itself, was sufficient to provide reasonable grounds for a forcible stop, let alone probable cause for an arrest, we think it appropriately could have contributed to a decision to detain the appellants temporarily.

**9.** *Compare, e. g., United States v. Ramos–Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975) (encounter "was an arrest, as opposed to an investigatory stop, because the agents at gun point, under circumstances not suggesting fears for their personal safety, ordered the appellant and his passenger to stop and put up their hands").

**10.** That the agents subjectively intended to effect an arrest should not be controlling when the objective circumstances are consistent with an investigatory stop. Several courts have gone a step further by ruling that, even where an officer formally makes an arrest for which probable cause is lacking, a subsequent search which is no more intrusive than that permitted under *Terry v. Ohio* is lawful if there were in fact adequate grounds for a stop and frisk.

*See, e. g., People v. Baker*, 12 Cal.App.3d 152, 90 Cal.Rptr. 508, 512, 518–19, (1970); *People v. Stevens*, 183 Colo. 399, 517 P.2d 1336, 1339–40 (1973), *rev'd on habeas corpus appeal sub nom. Stevens v. Wilson*, 534 F.2d 867, 870 (10th Cir. 1976); *State v. Romeo*, 43 N.J. 188, 203 A.2d 23, 32 (1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 668, 13 L.Ed.2d 563 (1965); *State v. Walton*, 159 N.J.Super. 408, 388 A.2d 268, 271–72 (1978). The rationale is that "despite the contemporaneous characterization by the officer, he in fact did no more than he was authorized to do by *Terry*." 3 W. LaFave, *supra* note 6. at 35. We offer no view as to the propriety of this approach, since we are faced only with a possible subjective intention to arrest and not with any verbal manifestation of that intention.

**11.** A DEA agent is specifically authorized to "make arrests without warrant ... (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony ...." 21 U.S.C. § 878(3) (Supp.1979).

gas exited and drove off, with Rodriguez discarding the crumpled white bag and appearing to stuff something under his shirt before entering the vehicle; Vargas periodically peered out the car's rear window; immediately after Vargas looked directly at the pursuing agents, the car sped up slightly and veered around another vehicle; and three packages of mannite and several small amber bottles were seen in the car after it was stopped.

Had the individuals under surveillance been complete strangers to the DEA agents, these actions alone would not have afforded probable cause to arrest.[12] As noted, however, the DEA had received a varied collection of reports concerning the defendants from both confidential informants and other sources. The information from the former group fell into three categories: (1) two informants had reported that Crespo and Diaz were major narcotics traffickers from New York and that Crespo travelled to Boston almost weekly with large amounts of heroin and cocaine; (2) four informants had stated that Rodriguez was a major heroin and cocaine trafficker in the Boston area and Crespo and Diaz were his suppliers; and (3) a single informant had reported on August 2, 1979, that Crespo and Diaz were in Boston to meet with several local narcotics traffickers. In addition, the DEA had learned from an assistant district attorney in New York that Crespo had three cases pending there involving the sale of cocaine, that Diaz served as Crespo's bodyguard during drug transactions, and that Diaz had also been arrested for narcotics (actually firearms) violations. Rounding out the DEA's information was the Brookline Police report that the 1200 Beacon Street Motel–which Crespo often visited, according to prior DEA investigation–was an occasional drug distribution center.

As the district court appeared to recognize, and as the government concedes, the informants' tips all failed to comport with the two–pronged test established in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). There, the Court explained that a tip can suffice to establish probable cause only if the record [13] discloses "some of the underlying circumstances" (1) which provided the basis for the informant's specific allegations and (2) "from which the officer concluded that the informant ... was 'credible' or his information 'reliable.'" Id. at 114, 84 S.Ct. at 1514 (footnote omitted). At the suppression hearing, the government did attempt to establish the credibility of the various informants: the two individuals providing tips about Crespo and Diaz had given "numerous pieces" of reliable information in the past; the four informants who described Rodriguez's activities had previously supplied "several types" of reliable information; and the person who announced the presence of Crespo and Diaz in Boston had provided information concerning drug activities approximately five times in the previous two months, all of which had proven accurate but none of which had resulted in arrests. But the record is entirely devoid of any indication as to how these individuals acquired their information; there is no basis on which to judge whether, for example, they were relating personal observations or simply repeating "casual rumor[s] circulating in the underworld." *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589,

---

12. We recognize that each of these factors was also susceptible of innocent interpretation. Motel rooms are often the site of legitimate business and personal meetings. The knock on the door may not have been heard by the occupants, necessitating telephone contact from the would–be callers. The objects carried into the room were unidentified. The peering about may have been nothing more than aimless restlessness. The mannite may actually have been used as a laxative. As for the abrupt driving maneuver–we remind ourselves that the incident occurred in Boston.

13. Although *Aguilar* involved the sufficiency of an affidavit submitted in support of a search warrant application, its test is equally applicable to a determination, made on the basis of testimony at a suppression hearing, as to the lawfulness of a warrantless arrest. See, e. g., *McCray v. Illinois*, 386 U.S. 300, 304, 87 S.Ct. 1056, 1058, 18 L.Ed.2d 62 (1967). Whether a search warrant should issue and whether a warrantless arrest was lawful involve a "basically similar" analysis. *Spinelli v. United States*, 393 U.S. 410, 417 n.5, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

21 L.Ed.2d 637 (1969). Therefore, even if the testimony recited above was sufficient to establish the informants' veracity, *see generally* 1 W. LaFave, *Search and Seizure* § 3.3(b) (1978), their information failed to satisfy the "basis of knowledge" prong of the *Aguilar* test.

This is not necessarily a fatal flaw, however, for the government does not–and quite clearly could not–rely solely on this information to establish probable cause. Instead, it views the various tips as relevant factors which, in conjunction with the DEA's other information and independent surveillance, provided grounds for the arrests. We agree that the informants' reports can be considered in the probable cause determination notwithstanding their shortcomings under the *Aguilar* test. In *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), after concluding that an informant's tip failed to satisfy either prong of the *Aguilar* test, the Court stated: "This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. Rather, it needed some further support." *Id.* at 418, 89 S.Ct. at 590.[14]

The inquiry thus becomes whether all of the information provided to the DEA agents, together with their personal observations, sufficed to establish probable cause to arrest the appellants. We find the question a close one. The tip received on August 2, 1979, although important in triggering the DEA surveillance, contributed only marginally to the probable cause determination. The information provided was fully corroborated by the confirmation of Crespo's registration at the motel and by the arrival of Rodriguez and Diaz. But these events by themselves proved little, since the informant did not describe the purpose of the meeting. To infer solely from this tip, even as subsequently corroborated, that

criminal activity was afoot would have been entirely conjectural.

The remaining information, however, proved more inculpatory and was sufficient in our view to "permit the suspicions engendered by the [DEA's surveillance] to ripen into a judgment that a crime was probably being committed." *Spinelli v. United States*, 393 U.S. at 418, 89 S.Ct. at 590. That Rodriguez, Crespo and Diaz were reputed drug dealers, that Crespo frequently carried narcotics to Boston, and that Diaz functioned as Crespo's bodyguard during such trips were, of course, each significant. But especially telling was the fact that Crespo and Diaz were Rodriguez's suppliers. The agents' knowledge of this relationship enabled them reasonably to infer that a meeting between these individuals might involve a drug transaction. As a result, we think the agents justifiably could have discounted any possibly innocent interpretation of the events observed during surveillance. These events–including the defendants' generally secretive manner, their congregation during mid–day at a motel known as a site for narcotics activities, the curious manner in which Rodriguez and Diaz entered the motel room, the peculiar looking objects brought into the room, Rodriguez's appearing to stuff something under his shirt upon departing, Vargas's peering out the rear window, the seemingly evasive driving pattern, and the drug–related materials spotted in their vehicle–were already highly suspicious by themselves. We think the agents' prior information, notwithstanding its shortcomings under the *Aguilar* test, was sufficient to elevate these suspicions to the level of probable cause.

### III.

■ The appellants' remaining contentions can be dismissed more summarily. First, Rodriguez challenges the district

---

**14.** Nor do the informants' tips here constitute simply conclusory assertions of criminal reputation, which the *Spinelli* Court dismissed as unworthy of consideration. The affidavit there contained an allegation that Spinelli was "known" to the affiant and to other law enforcement officers as a gambler and an associate of gamblers. The Court regarded the state- ment as "a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision." 393 U.S. at 414, 89 S.Ct. at 588. Although the tips here certainly do bear upon the defendants' reputations, they also contain a modicum of factual explication which suffices, in our view, to distinguish them from the averment in *Spinelli*.

court's denial of his motion to suppress the evidence seized at the motel room pursuant to a search warrant. We agree with the lower court that the contested search did not implicate Rodriguez's fourth amendment rights and that he therefore lacked "standing" to mount this challenge. Even if conspiracy to possess narcotics could be deemed a possessory offense, the Supreme Court has recently abolished the rule of automatic standing that formerly applied in such cases. *United States v. Salvucci,* — U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Instead, Rodriguez can claim the protection of the fourth amendment only if he had a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). This he plainly lacked. Not only was the motel room registered to another individual, but Rodriguez was not even present when the search occurred. His only link with the room was a twenty–five minute visit which occurred some eight hours prior to the search. No "legitimate expectation of privacy" could have accrued on the basis of this fleeting contact.[15]

■ Second, both appellants challenge the denial of their respective motions for a judgment of acquittal. In assessing the correctness of such a denial, we must view the evidence considered as a whole, including all inferences that may reasonably be drawn therefrom, in the light most favorable to the government, and must then determine whether a reasonable person so viewing the evidence could find guilt beyond a reasonable doubt. *United States v. Fortes,* 619 F.2d 108 at 122 (1st Cir., 1980); *United States v. Indelicato,* 611 F.2d 376, 384 (1st Cir. 1979). We conclude that a reasonable juror could have found the appellants guilty beyond a reasonable doubt of conspiracy to possess heroin and cocaine with intent to distribute. The drugs and related paraphernalia seized in the motel room, of course, confirmed the existence of a narcotics operation. That the appellants had agreed to participate in this criminal scheme was convincingly established by the evidence at trial. The fact that Rodriguez, upon arriving at the motel, proceeded directly to room 126 indicated his awareness of Crespo's location, and the peculiar manner of entry was inferably a prearranged pattern. The jury could have concluded that the box–shaped object which Rodriguez removed from his trunk and carried to the room was the triple beam balance scale subsequently seized, judging from that object's shape and the fact that the paper bag discarded by Rodriguez contained cardboard packaging for such a scale. The fact that he arrived with Diaz but departed with Vargas undercut any suggestion that Rodriguez was simply an innocent associate accompanying one of the other defendants. And Rodriguez's statement, upon his arrest, disavowing ownership of the mannite and amber bottles found in his car indicated his awareness of their drug–related uses. Vargas, in turn, not only was present in the motel room when the agents commenced surveillance but paid for the day's rent. The receipt given to him at that time was subsequently found on Crespo. The jury reasonably could have inferred that the orange, cylindrical object which Vargas carried into the room was the hydraulic pump discovered there. Finally, Vargas's possession of a room key at the time of his arrest indicated an intention on his part to return to the motel. We think the jury could properly have concluded beyond a reasonable doubt that both appellants were knowing participants in the narcotics scheme, rather than innocent bystanders who inadvertently stumbled upon a criminal operation conducted by the other defendants.

*Affirmed.*

---

**15.** Since Vargas has not challenged the motel room search, we need not decide whether his presence in the room when Agent Simpkins gained entry, his payment of the day's rent, and his subsequent possession of a room key were sufficient to create such an expectation of privacy on his part.