COMMONWEALTH *vs.* JOHN P. EGAN.

Norfolk.  September 15, 1981. — November 30, 1981.

Present: BROWN, DREBEN, & KASS, JJ.

*Search and Seizure,* Threshold police inquiry, Automobile, Consent. *Evidence,* Admissions and confessions. *Constitutional Law,* Search and seizure, Admissions and confessions. *Practice, Criminal,* Severance, Argument by prosecutor, New trial. *Attempt. Burning of Property.*

Police officers who discovered an automobile doused with gasoline in a relatively isolated and untravelled area sometime after midnight and five minutes later about one-quarter mile from the gasoline-doused automobile encountered a second automobile, which did not stop when signalled to do so, were reasonably warranted in stopping the second automobile for further investigation. [659-661]

In a criminal case evidence that police officers investigating the presence of a gasoline-doused automobile sometime after midnight in a relatively isolated and untravelled area stopped a second vehicle registered in the same town as the abandoned automobile, that when a police officer asked to look in the trunk the driver claimed not to have the key, that when the request was repeated five minutes later he produced a key, and that the driver was a police officer with twenty-one years of experience warranted findings that the driver consented to the search and that the circumstances were not coercive. [662-663]

Police officers investigating the presence of a gasoline-doused automobile sometime after midnight in a relatively isolated and untravelled area had probable cause to arrest the driver of a second automobile encountered five minutes later about a quarter of a mile from the abandoned automobile where the driver of the second automobile failed to stop when signalled to do so, where he gave no explanation of his presence there when stopped after a chase, where both the abandoned automobile and the second one were registered in the same town, and where a can of gasoline was found in the trunk of the second automobile. [664]

There was no error in joinder for trial of indictments arising from the attempted burning of an automobile with indictments for attempted intimidation of two witnesses, the owner of the automobile and her sister, who had dated the defendant. [665]

While the manner in which the prosecutor in a criminal case characterized the evidence may have been questionable in certain details, there were no gross distortions and, hence, no substantial likelihood of a miscarriage of justice. [666]

At the trial of indictments arising from the attempted burning of an automobile there was sufficient evidence to warrant verdicts of guilty. [666]

A defendant convicted on indictments arising from the attempted burning of an automobile was not entitled to a new trial on the ground of newly discovered evidence where the fresh material related to the size and kind of barriers which marked the dead end portion of the street on which he had been stopped by police. [666]

INDICTMENTS found and returned in the Superior Court Department on May 21, 1979.

The cases were tried before *Donahue, J.*

*Sherrill P. Cline (Russell Wilkins* with him) for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

KASS, J. After convictions on indictments for attempted burning of a motor vehicle, malicious injury to a motor vehicle, and larceny of a motor vehicle, the defendant has raised three claims of error regarding fruits of a search and pretrial interrogation which he thinks ought to have been suppressed. He also raises four claims of error in the conduct of the trial. We affirm.

1. *The Propriety of the Investigatory Stop.*

At the outset we are asked to consider whether justification existed for an investigatory stop of an automobile and interrogation of its occupants. The applicable principles have been much discussed. See *Commonwealth* v. *Riggins,* 366 Mass. 81, 86-87 (1974); *Commonwealth* v. *Silva,* 366 Mass. 402, 406-407 (1974); *Commonwealth* v. *Ling,* 370 Mass. 238, 240-241 (1976); *Commonwealth* v. *Almeida,* 373 Mass. 266, 270-272 (1977); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 504 (1978); *Commonwealth* v. *Ferrioli,* 10 Mass. App. Ct. 489, 491-492 (1980); *Commonwealth* v. *Ellis, ante* 612 (1981).

In *United States* v. *Cortez*, 449 U.S. 411 (1981), the Supreme Court essayed an analysis of the assessment which courts should make in determining whether "articulable reasons" or "founded suspicions"[1] exist which authorize police to stop and question a person. There should be objective information or observations from which a trained officer may draw inferences and make deductions — "inferences and deductions that might well elude an untrained person." *Id.* at 418. "[A]n assessment of the whole picture must yield a particularized suspicion . . . that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418. Thus a hunch, or good faith, on the part of the officer is not enough. *Commonwealth* v. *Bacon*, 381 Mass. 642, 643 (1980).

We now apply these principles to the facts found by the trial judge in the case at hand when he acted on a suppression motion. See *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980). While investigating an icy street condition at 12:45 A.M., Daniel Sullivan, a Canton police officer, noticed red lights reflected in trees. He deduced that these were car lights and, as no car had passed him on Elm Street, the street he was checking, Sullivan got into his police cruiser to investigate the source of the lights. What he found about a quarter mile up the road was a parked 1969 Pontiac with no one in it. Elm Street is heavily wooded, with houses along one side. Sullivan found that the Pontiac was doused with gasoline, inside and out. Supposing that he had interrupted a burning in progress, Sullivan radioed the other officer who was patrolling the area and asked him to stop any vehicle coming out of Greenlodge Street onto Route 138. If, as Sullivan suspected, a car was fleeing the scene, that was the route it was likely to take. After making a sweep of Greenlodge Street to Route 138 and back, Sullivan returned to the intersection of Greenlodge and Elm Streets and explored a dead-end portion of

---

[1] The Court observed at 417 that the quoted phrases are not self-defining.

Greenlodge Street which extended beyond the intersection with Elm. At this point he was joined by a second police officer, Kelliher, who arrived in another cruiser. Finding nothing in the dead-end portion of Greenlodge Street the two officers, each in his police cruiser, turned around and drove back to the Elm Street intersection. Before they got there, a car came toward them; they had seen no other cars in the intervening time. That encounter occurred about five minutes after Sullivan had spotted the gasoline-doused Pontiac and at a point approximately one-quarter mile from where that car stood.

Both police officers turned on their blue flashing lights, but the oncoming car failed to stop and proceeded down the dead-end portion of Greenlodge Street. The police made a U-turn, gave chase and, after about a quarter of a mile, the car stopped.

What, if any, particularized suspicion may be deduced from these facts? First, a serious crime was apparently in progress. See *Commonwealth* v. *Breen*, 357 Mass. 441, 446 (1970) (armed robbery had occurred), *Commonwealth* v. *Ling*, 370 Mass. at 240-241 (suspected burglary), and *Commonwealth* v. *Johnson*, 6 Mass. App. Ct. 944, 945-946 (1978) (robbery had occurred). Second, the area was remote, relatively isolated and untravelled and the hour was late. Third, it was at least likely that the arsonist would return to finish his job. Fourth, the location of the encounter was proximate in place and time to the discovery of the Pontiac. See *Commonwealth* v. *Johnson, supra* at 945-946. Fifth, the car did not stop when signalled so to do. In light of all the circumstances, it would be an inattentive officer who did not make an investigatory stop. See *Commonwealth* v. *Ferrioli*, 10 Mass. App. Ct. at 491. See also G. L. c. 41, § 98, as amended by St. 1967, c. 368, § 1. Compare *Commonwealth* v. *Corridori*, 11 Mass. App. Ct. 469, 477-478 (1981), involving a combination of facts which added up to a suspicious picture. Contrast *Commonwealth* v. *Bacon*, 381 Mass. 642 (1980); *Commonwealth* v. *Ellis, ante* 612 (1981).

2. *The Search of the Trunk of Egan's Car.*

When they first approached Egan's car, the police officers did so with guns drawn. They noticed a Brookline police sticker on the car and inquired if Egan was a police officer. Egan established that he was a member of the Brookline force and the Canton policemen, having also checked the glove compartment of Egan's car for weapons, holstered their own. When asked about the gas-soaked car on Elm Street, Egan and his passenger professed ignorance. Sullivan asked to have a look at the trunk of Egan's car; the latter said he did not have a key. A registration check of both vehicles, the one Egan was driving and the abandoned Pontiac, ensued and established that the owner of each lived in Brookline. That coincidence reasonably excited the suspicions of the Canton police officers that Egan might be connected with the incipient burning.

By this time about five minutes had elapsed and a third member of the Canton police, Sergeant Lenhart, arrived on the scene. Lenhart repeated the request to examine the trunk of Egan's car. This time the defendant did not protest that he lacked a key. The trial judge, who also heard the suppression motion, found that Egan consented to a search of the trunk and that, indeed, Egan himself opened the trunk lid. In the trunk Lenhart found a red cannister; it smelled of gasoline and felt, Lenhart said, "approximately a quarter full."

Egan attacks the search and the finding that it was consented to on the grounds that the circumstances were inherently coercive and that he and his companion were detained beyond the scope of a threshold inquiry. Contrast *Dunaway* v. *New York*, 442 U.S. 200, 208-216 (1979), involving removal of a suspect to a police station for further "threshold questioning." We need not decide if the presence of Egan past midnight in this relatively remote area of Canton, his initial refusal to stop when the police signalled him, the coincidence of the Brookline registrations, and the claim not to have a key for the trunk of his car provided probable cause for an arrest. It was sufficient to warrant further

questioning. See *Commonwealth* v. *Salerno*, 356 Mass. 642, 646-647 (1970), and cases cited. When Lenhart repeated his colleague's request to examine the car trunk, about five minutes had elapsed since the initial stop.

Whatever intimidating — and hence overpowering — effect questioning by police may have in some circumstances, the judge could find, as he did, that this was not the case with Egan, who was a sergeant in the Brookline police, with twenty-one years of experience. The judge found him to be "strong-minded and intelligent" and could conclude that it was not plausible that Egan's consent to an examination of the trunk of his car was compelled. His personal characteristics could be taken into account by the judge in assessing whether, in the circumstances, the consent was voluntary. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226-227 (1973). See *Hoover* v. *Beto*, 467 F.2d 516, 521 (5th Cir.), cert. denied, 409 U.S. 1086 (1972) (lawyer consented to search); *United States* v. *Bailey*, 468 F.2d 652, 658, 672 (5th Cir. 1972) (highway patrol officer made a statement); *United States* v. *Juarez*, 573 F.2d 267, 274 (5th Cir.), cert. denied, 439 U.S. 915 (1978) (lawyer consented to search). A law enforcement officer of Egan's experience would have known that he could choose to resist Lenhart's request to search his car trunk. His cooperative conduct obviated the need for a search warrant. *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496-497 (1976).

3. *Admissibility of the Stationhouse Statements.*

After he discovered the gas can, Lenhart told Egan and his companion, Mellen, that they were suspects in an attempted burning and that there was probable cause to arrest them. No formal arrest was made, but Egan and Mellen were asked to accompany the police to the station for questioning. Egan and Mellen proceeded there in Egan's car. We may assume that, notwithstanding the absence of a formal arrest, Egan was in a custodial situation. The episode had begun with drawn guns, his car had been searched, he was told he was a suspect. See *Commonwealth* v. *Wallace*, 346 Mass. 9, 16 (1963). Compare *Commonwealth* v. *Cruz*,

373 Mass. 676, 683 (1977). At the police station, Lenhart advised Egan of his Miranda rights (*Miranda* v. *Arizona*, 384 U.S. 436 [1966]).[2] Only two questions were answered before Egan ended the stationhouse interview by saying he refused to say more without an attorney present. One had to do with whether he knew the area in which he was stopped, to which he answered, "No, I don't." The second was whether he knew a Leslie Brill [Rotman]. The answer was: "Yes, I go out with her sister. She has been trying to break us up because I am not Jewish." Rotman was the owner of the gasoline-soaked car.[3] Both statements were used as prior inconsistent statements against Egan at his trial.

The defendant raises no issue of the voluntariness of the statements. Manifestly a police officer of Egan's experience understood the Miranda warning and his right to remain silent. It is a right which, indeed, Egan asserted after the first two questions. He was then permitted to leave the police station. The basis for suppression is that he was improperly detained. Cf. *Brown* v. *Illinois*, 422 U.S. 590, 600 (1975). At the time Egan was asked to the police station the police had discovered the quarter-full gas can in his car. That fact, tied together with the defendant's presence near the apparent crime, the lack of explanation of his presence there, the failure to stop, and the Brookline connection, gave the police reason to think that Egan had committed or was committing an offense. *Commonwealth* v. *Storey*, 378 Mass. 312, 321-322 (1979), cert. denied, 446 U.S. 955 (1980), and cases cited. To the extent, therefore, that Egan was in the police station under arrest (rather than on his own volition), probable cause existed to arrest him.

---

[2] We note that Sergeant Lenhart testified that, after giving them Miranda warnings, he told Egan and Mellen they were free to leave the station if they chose not to answer questions. The judge made no findings as to whether permission to leave was in fact communicated to Egan and Mellen.

[3] The former Leslie Brill had married, but her married name apparently did not appear on motor vehicle registration records when the police checked the registration of her car.

4. *Joinder of the Indictments.*

Nine months after Egan was indicted for attempted burning and malicious injury to and theft of a motor vehicle, he was indicted for attempted intimidation of two witnesses in those pending cases. The intimidation charges arose out of complaints by Sheryl Brill, who had for a time lived with Egan, and Leslie Brill Rotman, who was Sheryl's sister and the owner of the car which Egan was charged with having stolen and attempted to burn.[4]

The Commonwealth, pursuant to Mass.R.Crim.P. 9 (a) (3), 378 Mass. 859 (1979), moved for joinder of the intimidation indictments with the burning related indictments for purposes of trial.[5] Whether two or more indictments shall be tried together rests in the sound discretion of the trial judge. *Commonwealth* v. *Jervis*, 368 Mass. 638, 645 (1975). *Commonwealth* v. *Cruz*, 373 Mass. 676, 690 (1977). Evidence as to each of the offenses was connected with a single line of conduct. *Commonwealth* v. *Maloney*, 348 Mass. 610, 614 (1965). *Commonwealth* v. *Cullinan*, 9 Mass. App. Ct. 895 (1980). The broken relationship between Sheryl and Egan bore on what motivated Egan to arson. As to the threats against Sheryl and Leslie, they would, if proved, exhibit consciousness of guilt, and the same evidence concerning them would be admissible in the trial of the primary charges.[6] See *Commonwealth* v. *Leo*, 379 Mass. 34, 41 (1979); *Commonwealth* v. *Ellis*, *ante* 612, 618-621 (1981). Contrast *Commonwealth* v. *Blow*, 362 Mass. 196, 200 (1972).

---

[4] Egan had been linked to the Rotman vehicle in other respects. There was evidence that the ignition of the car had not been tampered with, permitting the jury to infer that whoever drove the car to the spot where it was found in Canton had keys to it. There was evidence that the Pontiac had been stolen while outside Leslie's apartment and that, during friendlier times, Egan had occasion and means to come into possession of a set of keys to Leslie's car.

[5] The trial of Egan's companion, Mellen, was severed.

[6] As things developed, the jury acquitted the defendant of the intimidation charges.

5. *Other Assertions of Error.*

(a) No objection was made by the defendant's trial counsel to the prosecutor's closing argument. Improprieties in the Commonwealth's closing argument have been asserted for the first time on appeal and the defendant, therefore, is entitled to review only upon a showing that there is a substantial likelihood that a miscarriage of justice will occur. *Commonwealth* v. *Roberts*, 378 Mass. 116, 122-123 (1979). *Commonwealth* v. *Harris*, 11 Mass. App. Ct. 165, 177 (1981). While the manner in which the prosecutor characterized the evidence may have been questionable in certain details, we perceive no gross distortions, and, hence, no substantial likelihood that a miscarriage of justice will occur.

(b) Egan argues that the Commonwealth's evidence is so thin (he characterizes it as a "house of inferences without a firm foundation") that he was entitled to required findings of not guilty. We have heretofore reviewed a number of the facts which the jury might have found and it would serve little purpose to rehearse them further. We are satisfied that the evidence was sufficient to enable a rational mind to conclude beyond a reasonable doubt that Egan had committed the crime with which he was charged. *Commonwealth* v. *Latimore*, 378 Mass. 671, 678 (1979).

(c) Following the return of verdicts of guilty by a jury, the defendant moved unsuccessfully for a new trial based on newly discovered evidence. The fresh material had to do with the size and kind of barriers which marked the dead-end portion of Greenlodge Street. It was a peripheral subject in the context of the trial as a whole and we can hardly say that the judge abused his discretion in determining that the evidence proffered "was not crucial to the government's case nor to the defendant's credibility." The applicable principles are discussed in *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651 (1980).

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*