COMMONWEALTH *vs.* LEON GROVES (and five companion cases[1]). No. 87-460. December 30, 1987. *Search and Seizure*, Automobile. *Constitutional Law*, Search and seizure. *Robbery*. *Firearms*.

As Marvin Gilmore returned to his home in Cambridge in the early morning hours with cash receipts from a nightclub he operated, he was met in the driveway by a masked man pointing a gun at him. What followed ended approximately thirty minutes later when Gilmore was locked in the

---

[1] Two of the cases are against Leon Groves and three are against Raphael Groves.

trunk of his car. He managed to make a quick escape, drive off, and notify the police. Shortly thereafter, near the border between Cambridge and Somerville, the police arrested the defendants. Of the offenses with which they were both charged, they were each convicted of armed robbery while masked, assault and battery by means of a dangerous weapon, and unlawfully carrying a firearm. On appeal, both defendants claim that their motions to suppress evidence, seized upon arrest from their persons and automobile, and a gun thrown from the automobile should have been allowed. Raphael Groves claims, in addition, that the evidence of his involvement in the incident in Gilmore's driveway was insufficient to justify his convictions. We affirm all of the convictions of both defendants.

1. *The motions to suppress.* The judge who heard the motions to suppress made subsidiary findings of fact which are not contested by the defendants. We summarize them. At about 2:45 A.M., a masked black male came to the door of Gilmore's car as he stopped in the driveway and held a .357 magnum handgun to Gilmore's head. The robber took a leather case containing money and business papers from the car. He had Gilmore lie on the ground. He took Gilmore's wallet and jewelry. He broke one of Gilmore's fingers trying to remove a ring. Twice he pulled the trigger while the gun was pointed at Gilmore's head at close range, but the gun did not fire. He yelled "yo" and looked directly behind Gilmore, giving the impression that there was an accomplice. He then ordered Gilmore into the trunk of the car and closed it. Gilmore worked his way out through the back seat. He drove the short distance to Porter Square, where he informed Cambridge police officers about the crime and described the perpetrators as being two black·males, one light-skinned and one dark-skinned, Jamaicans, one with long braided hair. The Cambridge police notified the Somerville police, who broadcast descriptions of the perpetrators only as being two black males, one with long stringy black hair. Within minutes, Shaun Canty, a Somerville police officer, heard the information broadcast over the police radio. He immediately drove towards the Cambridge line. A few minutes later, at about 3:30 A.M., he saw an automobile occupied by two black males fitting the descriptions he had heard. The two occupants were the defendants. The passenger was sitting tense and erect, appearing to peek at the cruiser while the driver looked out his rear window at the cruiser as he passed by. No other cars were in the vicinity at that time. Canty radioed for assistance. For a distance of one fourth of a mile he followed the car and observed it, but he did not impede its travel or make a signal for it to stop. As the defendants' car arrived at an intersection, with a green light facing them, a second police cruiser, followed by a third police cruiser, approached the intersection from a street perpendicular to the one in which the defendants' car was being followed by Canty's cruiser. Although still no signal to stop had been made by any of the officers, and although the cruisers were not impeding the movement of the defendants' car, it suddenly crossed over a sidewalk and sped away. A chase ensued during the course of which

a gun was tossed from the passenger window of the fleeing car. Eventually, the defendants' car crashed and the defendants attempted to flee on foot, but they were quickly arrested. Incriminating evidence, including the leather case containing the money, the wallet, and the mask, was recovered in a search of the car and the defendants, and a .357 magnum handgun was recovered near the place where the officers had seen it being thrown from the car. On these facts, the motion judge concluded that the police were justified in pursuing the vehicle. Implicitly, he ruled that the pursuit had not begun until the defendants suddenly sped off from the interesection.

The defendants concede that, if they were not already under pursuit, their acts of driving over a curb and speeding off would have justified the police in pursuing them. They claim that the "pursuit" actually began at a point in time before they sped away, however, and that at that earlier point in time the police lacked reasonable grounds to suspect that they had committed a crime. See *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981). The defendants contend that "pursuit" started when Canty first began to follow them. Since Canty neither signaled the driver to stop (by use of a siren or blue lights, or in any other way), nor impeded the defendants' free passage, the "pursuit" did not commence when he first began to follow them. See *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. 417, 419-420 (1982); *Commonwealth* v. *Oreto*, 20 Mass. App. Ct. 581, 585-586 (1985); *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 288-290 (1986). Canty's actions in following the car for a very short distance amounted to surveillance, not "pursuit". The defendants have a fallback position. The "pursuit" began, they argue, at the very latest, when a second police cruiser arrived at the intersection. They contend that by that time the officers appeared to be intending to make a stop. Even at that point, however, there was no overt step taken by the police to stop the car or impede its course of travel. We agree with the judge that, whatever the police officers may have had in mind about making a stop and conducting a threshold inquiry, until they had given the defendants a signal to stop or in some way blocked their movement, there was no "pursuit." Thus, whatever the state of the officers' knowledge at the time about the defendants' involvement in the crime prior to their speeding away,[2] neither their Fourth Amendment nor their State constitutional rights were violated. Contrast *Commonwealth* v. *Thibeau*, 384 Mass. at 764; *Commonwealth* v. *Helme*, 399 Mass. 298, 300-303 (1987). On the contrary, given the report the police had just heard about the commission nearby of a serious crime involving the use of a gun, their attentive obser-

---

[2] Nothing we have said should be read as suggesting that we would conclude that Somerville police officer Canty was not aware of specific and articulable facts giving reasonable grounds to suspect the defendants of criminal activity at the time he began to follow their car. If he had such grounds, it would be academic when the pursuit actually began. For cases discussing the difficult line-drawing process often required to determine whether the police had enough information to make an

vation of the sparse traffic in the area, in the circumstances, was entirely appropriate for both investigative purposes and for protection of the public.

2. *The sufficiency of the evidence as to Raphael Groves.* At trial, Raphael Groves failed to raise by appropriate motion the issue of the sufficiency of the evidence of his guilt of any of the three offenses with which he was charged. We therefore consider his contentions on appeal to determine if there was a substantial risk of a miscarriage of justice. There was not. Gilmore's employees often viewed him carrying a gun and placing the nightclub's receipts in a leather bag to take home with him. There was evidence that Raphael Groves was a regular patron at Gilmore's nightclub and a close friend of a waitress who worked there. He often waited for the waitress before leaving the nightclub. It may be assumed, therefore, that he had some familiarity with Gilmore's usual procedure for removing the nightclub receipts and the fact that Gilmore occasionally carried a gun. Leon Groves was also known to Gilmore before the incident as a customer at the club. Gilmore testified that during the incident Leon Groves, the masked robber who brandished the gun, repeatedly directed him to look forward, in the direction of Leon Groves. Gilmore testified that he sensed that another individual was in the driveway, based upon his having heard Leon Groves call out "yo" to someone behind Gilmore, having seen Leon Groves look directly behind him, and having heard noises coming from behind him. Raphael Groves was seen driving a car in which Leon Groves was a passenger, presumably the getaway car, fifteen minutes after the crime was reported. The car sped off when the police presence was noted, and when it crashed, Raphael Groves, along with Leon, attempted to run from the police. Raphael Groves had Gilmore's wallet on his person when he was arrested. The mask and proceeds of the robbery were in the car he was driving. The evidence amply supports the inference that Raphael Groves participated with Leon Groves in planning the masked armed robbery and carrying it out. "The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). See also *Commonwealth* v. *Sylvester*, 400 Mass. 334, 339 (1987). Specifically, on the compelling array of evidence before them, the jury reasonably could infer that Raphael Groves knew and intended that Leon Groves, to effectuate the planned robbery, would use a gun and wear a mask to hide his identity. See *Commonwealth* v. *Ferguson*, 365

investigative stop, see *Commonwealth* v. *Riggins*, 366 Mass. 81, 86-87 (1974); *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974); *Commonwealth* v. *Wren*, 391 Mass. 705, 708 (1984); *Commonwealth* v. *Helme*, 399 Mass. 298, 301 (1987); *Commonwealth* v. *Egan*, 12 Mass. App. Ct. 658, 661 (1981); *Commonwealth* v. *Benbow*, 16 Mass. App. Ct. 970, 970-971 (1983). Because we agree with the motion judge that "pursuit" had not begun before the defendants suddenly sped away from the intersection, it is not necessary for us to decide in this case whether Canty, when he initially followed the car, had merely a hunch or a reasonable suspicion.

Mass. 1, 9 (1974); *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980); *Commonwealth* v. *Millyan,* 399 Mass. 171, 187 (1987); *Commonwealth* v. *Amaral,* 13 Mass. App. Ct. 238, 243-244 (1982); *Commonwealth* v. *Knight,* 16 Mass. App. Ct. 622, 624 (1983), *S.C.* 399 Mass. 192, 193 (1984). Thus, Raphael Groves' conviction of armed robbery while masked was warranted on a joint venture theory. So, too, was his conviction of assault and battery by means of a dangerous weapon. The same facts and the inferences which could be drawn from them were sufficient to permit the jury to find that, to effectuate the robbery, Raphael Groves was at least willing to have Gilmore assaulted and beaten with the gun. See *Commonwealth* v. *Richards,* 363 Mass. 299, 308 (1973).

Finally, Raphael Groves contends that there was insufficient evidence to implicate him in the unlawful carrying of the gun. He emphasizes that it was Leon Groves who tossed the weapon from the fleeing car. Raphael Groves was driving during the chase, however, and it would have been difficult for him at the same time to throw it from a window. The gun had been used to carry out the robbery in which both defendants were involved. In the circumstances, we think it was a reasonable inference that Raphael Groves knew the gun was in the car and that he had the ability and intention to exercise control over it. See *Commonwealth* v. *DiMatteo,* 12 Mass. App. Ct. 547, 554 (1981); *Commonwealth* v. *Montgomery,* 23 Mass. App. Ct. 909, 912 (1986).

*Judgments affirmed.*

*Eric Brandt,* Committee for Public Counsel Services, for Leon Groves.
*Ronald Nacamuli* for Raphael Groves.
*Corinne Hirsch,* Assistant District Attorney, for the Commonwealth.