COMMONWEALTH *vs.* VICTOR COSME.

Middlesex. January 17, 1983. — March 10, 1983.

Present: GREANEY, KAPLAN, & DREBEN, JJ.

*Search and Seizure,* Probable cause, Threshold police inquiry. *Probable Cause. Constitutional Law,* Search and seizure. *Radio Message.*

At the hearing of a motion by a criminal defendant to suppress from evidence articles seized without a warrant from an automobile on a public highway by the police acting on information contained in police radio broadcasts which they had received, the Commonwealth met its burden of showing that the police had probable cause to search the automobile where the source for the first radio broadcast, which gave a firsthand description of an automobile and its occupants sought in connection with an attempted breaking and entering of an apartment building, was a communication from the apartment owner, where the initial broadcast had been independently verified and repeated for the police officers before the stop and the search were made, and where the detailed tip received by the officers was confirmed by the appearance on the highway of the vehicle described in the radio broadcasts. [451-453].

INDICTMENTS found and returned in the Superior Court Department on November 18, 1980.

A motion to suppress evidence was heard by *Ronan, J.*

An application for an interlocutory appeal was allowed by *Liacos, J.* in the Supreme Judicial Court for the county of Suffolk, and the appeal was transferred by him to the Appeals Court.

*Mark Regan* for the defendant.

*Claudia R. Sullivan,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Having been indicted under seven indictments comprising charges of possessing burglarious tools; breaking and entering with intent to commit larceny and

committing the same; breaking and entering with intent to commit a felony; and attempting to break and enter with intent to commit a felony, the defendant moved in Superior Court before trial to suppress evidence of these charges seized at an automobile stop and search. After hearing, the motion was allowed. The Commonwealth applied under G. L. c. 278, § 28E, and Mass.R.Crim.P. 15 (b)(2), 378 Mass. 884 (1979), for leave to appeal. A single justice of the Supreme Judicial Court granted the application and transferred the appeal to this court. We reverse the suppression order.

We recount the facts brought out at the hearing centering on the stop, and then elaborate on the information available to the police. About 11:50 A.M., October 2, 1980, State Trooper Burson, on duty in a marked cruiser on Route 495 near the Route 119 interchange, received a radio broadcast from his dispatcher at Concord barracks to look for a green Buick, Massachusetts registration 736-ELI, with four male occupants, last seen headed west on Route 2A from Acton toward Littleton, sought in connection with an attempted breaking and entering in an apartment complex in Acton. Burson stationed himself to intercept the car on Route 2A in Littleton. About 12:05 P.M. a green Buick with the specified plate and three male occupants passed by headed west. Burson radioed his location to his dispatcher, stopped the car, ordered the men out, asked their names, and requested identification. The defendant, who was driving did not produce a license, and offered only a Social Security card. Burson reported the stop, and the Acton dispatcher broadcast this news.

Around the time Burson gave the men their Miranda rights, Officer O'Dea of the Littleton police and Officer Rogers of the Acton police arrived in their respective vehicles. They spoke to Burson. Looking into the Buick, Burson and Rogers observed jewelry and other valuables strewn about the floor on the passenger side; also on the car floor, a Minolta camera, a Vivatar flash unit, and a small jewelry box; on the front seat, a Polaroid camera; and, stuffed

partially under the front seat, a pillowcase colored tur-
quoise, white-checked with a small flower design. Burson
removed these items and placed them on the hood of the
car. The pillowcase was emptied of numerous items of
jewelry, coins, a silver creamer, a wrench, and a credit card
receipt bearing the address of an Acton apartment complex,
10A Wampus Avenue, and the name of the subscriber
which differed from any name given by the three men.
Rogers asked his Acton dispatcher to have an officer make a
check at 10A Wampus Avenue. An officer, Johnson, was
ordered to that address where he found a front screen
removed from one of the apartments and the place in disar-
ray; missing from a bed was a pillowcase. When this infor-
mation was relayed back (Johnson to the Acton dispatcher
who radioed the message), the defendant and the two others
were placed under arrest. Further search of the car un-
covered two screwdrivers stuffed between the front seat
cushions.

To go back now to the beginning and develop the course
of the communications. The first broadcast came from the
Acton dispatcher about 11:35 A.M. with the details of the
green Buick, registration number, occupants, direction of
travel, and attempted break. The dispatcher instructed Of-
ficer Johnson (as Johnson testified) to go "to the scene of Mr.
White to speak to Mr. White, to confirm that the informa-
tion they received over the phone was true." Johnson went
to 374 Great Road, Acton, and spoke to White, the apart-
ment owner, who said he had interrupted two men trying to
pry open the sliding glass door of the apartment and had
seen them jump into a car, and so forth, all as had previous-
ly been broadcast. Johnson himself observed scratches on
the glass door. Johnson radioed his dispatcher confirming
the break and other information, whereupon, about 11:45-
11:50, the Acton dispatcher made a rebroadcast. Between
11:35 and 11:50 the Acton dispatcher communicated by
telephone with the dispatcher at Concord barracks, whence
came the message received by Burson.[1] Burson's report of

---

[1]The Acton dispatcher was in radio communication with all Acton
police units. He monitored radio communications between State police

the stop brought O'Dea and Rogers to the scene, as noted. It was the same Officer Johnson who was later ordered to 10A Wampus Avenue, and his report resulted in the arrests.

The foregoing account emerged at the hearing and conforms to the judge's findings which, of course, we respect. *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980). We differ from the judge in his ultimate legal conclusion. *Commonwealth* v. *Miller,* 366 Mass. 387, 389 (1974). *Commonwealth* v. *Accaputo,* 380 Mass. 435, 448 n.18 (1980). *Commonwealth* v. *Marchione,* 384 Mass. 8, 11 (1981).

Under *Commonwealth* v. *Antobenedetto,* 366 Mass. 51 (1974), the Commonwealth had the burden of showing that there was probable cause for the warrantless search, which entailed an assessment of what information was on hand. In the present case the judge evidently thought that the Commonwealth failed because it did not call the Acton dispatcher or White as a witness to establish the basis on which the dispatcher made his initial broadcast.

First, on the record there was a better than fair probability, even without calling either person (and only a fair probability is needed, *Brinegar* v. *United States,* 338 U.S. 160, 175-176 [1949]; *Commonwealth* v. *Stevens,* 362 Mass. 24, 26 [1972]; *Commonwealth* v. *Hason,* 387 Mass. 169, 174 [1982]; *United States* v. *Melvin,* 596 F.2d 492, 495 [1st Cir.], cert. denied, 444 U.S. 837 [1979]), that the source of the first broadcast was a communication from White, who had firsthand knowledge of the break and escape. Probably this was the reason Johnson was sent direct to White for confirmation. Johnson's testimony supports the inference. In fact the Commonwealth in its brief states that White reported the incident to the police, and the defendant in his brief adopts the Commonwealth's statement of facts. On

officers and their dispatcher at Concord barracks. However, in order to communicate with the State police dispatcher he had to use the telephone, and that was also the case in reaching the Littleton dispatcher.

this assumption, we would not need to go further to find the probable cause to justify not only the stop but also a comprehensive search of the car. *Commonwealth* v. *Tarver,* 369 Mass. 302, 308 (1975). *Commonwealth* v. *Cruz,* 373 Mass. 676, 684 (1977). *Commonwealth* v. *Gullick,* 386 Mass. 278, 279, 284 (1982). *Commonwealth* v. *Bakon,* 7 Mass. App. Ct. 892 (1979). See generally 1 LaFave, Search and Seizure § 3.4 (1978).

Quite apart from this, however, the actual stop was made after the criminal incident at White's apartment and other details had been verified shortly after 11:35, and the Acton dispatcher had made a rebroadcast. Burson received his call about 11:50, and the spotting of the jewelry occurred with the help of the Acton officer Rogers some minutes past 12:05. Even if it be assumed that there was an initial communication to the Acton dispatcher that lacked reliability, we think any requirement of *Antobenedetto* would be met by the fact that the Acton broadcast was independently verified and repeated before the stop and the search were made, yielding "reliable information that a crime had occurred and that the instrumentalities or evidence of that crime would be found in the vehicle described in the broadcast." *Antobenedetto,* 366 Mass. at 56. In this view also, a comprehensive search was lawful and could be made. *Chambers* v. *Maroney,* 399 U.S. 42, 46, 49 (1970). *United States* v. *Ross,* 456 U.S. 798, 801-802 (1982). *Commonwealth* v. *Riggins,* 366 Mass. 81, 85, 88 (1974). *Commonwealth* v. *Dupont,* 2 Mass. App. Ct. 566, 569-570 (1974).

The search may be justified in yet another way. No one contends that the stop itself was illicit: a detailed tip confirmed by the appearance of the very car would provide a proper basis for a stop to conduct an inquiry. *Commonwealth* v. *Riggins, supra* at 86-87. *Commonwealth* v. *Anderson,* 366 Mass. 394, 397-399 (1974). *Commonwealth* v. *Johnson,* 6 Mass. App. Ct. 944, 945 (1978). *Commonwealth* v. *McCauley,* 11 Mass. App. Ct. 780, 783 (1981). Here the law coincides with the necessities of

police investigation, for it would make no sense to leave an officer wringing his hands awaiting full confirmation while a car under such a cloud sped away. *Adams* v. *Williams,* 407 U.S. 143, 145-146 (1972). *Commonwealth* v. *Mc-Cauley, supra.* When a car is stopped in this exigent situation for momentary inquiry, an officer can seize legitimately not only contraband or instrumentalities "in plain view" but also items in that verge which in the circumstances and setting reasonably appear to be the fruits of crime and thus evidence to aid in its prosecution. *Harris* v. *United States,* 390 U.S. 234, 236 (1968). *Commonwealth* v. *Cavanaugh,* 366 Mass. 277, 281-283 (1974). *Commonwealth* v. *Moynihan,* 376 Mass. 468, 472-473 (1978). See *Warden, Md. Penitentiary,* v. *Hayden,* 387 U.S. 294, 307 (1967); *Commonwealth* v. *Bond,* 375 Mass. 201, 209 (1978); *Commonwealth* v. *Young,* 382 Mass. 448, 458-459 (1981). In the setting supposed, the jewelry and other property discovered could surely be thought to lack innocence. Thus, even on assumed facts far less compelling than the actual, the seizure would be lawful.

*Order of suppression reversed.*