COMMONWEALTH vs. ANTHONY SPAGNOLO
(and three companion cases[1]).

Suffolk.   October 21, 1983. — February 17, 1984.

Present: BROWN, GREANEY, & WARNER, JJ.

*Search and Seizure,* Probable cause, Automobile, Threshold police
   inquiry.

Where a judge in allowing a motion to suppress evidence failed to make a
   finding indicating whether he believed or disbelieved uncontradicted
   testimony by a police officer that he had first observed a Lincoln auto-
   mobile at the scene of a disturbance and coming from the direction in
   which four men had fled on foot, and where such a finding was essen-
   tial for a determination of the reasonableness of a subsequent stop of a
   Lincoln by the police officer, this court remanded the case for further
   findings by the judge and appropriate action on the motion.  [521-524]

INDICTMENTS found and returned in the Superior Court
Department on November 17, 1981.

Motions to suppress evidence were heard by *Garrity,* J.

The cases were reported to the Appeals Court by *Lynch,*
J., following his allowance of the Commonwealth's applica-
tion for an interlocutory appeal in the Supreme Judicial
Court for the county of Suffolk.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for
the Commonwealth.

*Henry D. Katz* for the defendants.

BROWN, J.   Each defendant was indicted on two counts of
unlawfully carrying a firearm under his control in a motor
vehicle.   The weapons in question were seized as a result of
a warrantless search.   A judge of the Superior Court al-
lowed the defendant's motions to suppress the evidence.   In

---

[1] The companion cases are against Frederick A. Simone, Robert F. Car-
rozza, and Vincent C. Gioacchini.

allowing the motions to suppress, the judge concluded that the Commonwealth had not shown a "sufficient foundation for a suspicion that unknown occupants of an automobile were engaged in wrongdoing." Pursuant to Mass.R.Crim.P. 15 (b) (2), 378 Mass. 884 (1979), the case was reported to the Appeals Court by a single justice of the Supreme Judicial Court, who, after hearing, allowed the Commonwealth's application for leave to appeal from the allowance of the defendants' motions to suppress.

Specific and articulable facts and reasonable inferences which flow therefrom are necessary to justify a stop motivated by suspicion that a crime has been, is being, or will be committed. See *Commonwealth* v. *Almeida,* 373 Mass. 266, 270-272 (1977). In addition, where the stop is of an automobile, such information must be shown to have been available before the automobile is stopped. In this regard, a stop of a vehicle will be deemed to have begun once the pursuit calculated to effect that stop has begun. *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981). Where a trial judge has made factual findings in support of his denial or allowance of a motion to suppress, "they will be accepted by an appellate court absent clear error." *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978). In addition, while a trial "judge's ultimate legal conclusion . . . is entitled to substantial deference, . . . such an ultimate legal conclusion, . . . drawn from the facts developed at the suppression hearing, is a matter for review . . . , particularly where the conclusion is of constitutional dimensions." *Commonwealth* v. *Jones, supra.* Thus, a trial judge's ruling on a motion to suppress may be reversed where the facts found are clearly erroneous or "where justice requires [that the appellate court] substitute its judgment for that of a trial judge at the final stage." *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980).

The clear error standard is a very limited form of review in this context. Where there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accept-

ed. *Commonwealth* v. *Jones, supra* at 354. "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of [an appellate] court." *Commonwealth* v. *Moon, supra* at 756.

With regard to the motion judge's findings, there is no question, with perhaps one exception, that his subsidiary findings were warranted by the evidence. The critical problem here relates to an absence in the judge's findings of a particular event which allegedly occurred and for which there is no contradictory testimony. In this regard, it is unclear whether the judge's failure to mention this event was inadvertent or whether he chose not to believe that the event occurred so that his failure to mention it was purposeful. Compare *Commonwealth* v. *Jones,* 9 Mass. App. Ct. 83, 90-91 (1980). The event in question is crucial in determining whether the officer's decision to follow and subsequently stop the automobile in which the defendants were riding was based upon a reasonable inference drawn from specific and articulable facts or whether it was based upon a constitutionally impermissible hunch or guess. Compare *Commonwealth* v. *Almeida,* 373 Mass. at 272.

We summarize the judge's findings. On September 4, 1981, Detective Michael Cutillo, a Revere police officer with eight years of experience, three in the rank of detective, was in an unmarked police vehicle with his partner, Detective Nunez, both in plain clothes. At some time during the early evening hours Detectives Cutillo and Nunez received a radio report of a disturbance at Zeke's Lounge. In response, Cutillo and Nunez drove to Zeke's Lounge, where they observed a large crowd of approximately twenty persons drunk and disorderly outside of the lounge. The detectives also observed that one Maureen Simone had been injured. She was bleeding and appeared to have a broken nose. Detectives Cutillo and Nunez spoke with Simone in an effort to learn the identity of her assailant, but they had no success. Prior to the officers' arrival Simone had been inside Zeke's Lounge. As she was attempting to make her

way through a crowd which had assembled, she was struck and knocked down. Apparently she lost consciousness. She could not recall either who struck her or what occurred after she had been struck. Cutillo did learn that Simone had been kicked in the nose by another woman. The lounge's proprietor, one Zalenda, had telephoned the Revere police department as a consequence of the disturbance, although he had not observed the events which had occurred outside the lounge. Cutillo and Nunez dispersed the crowd and left.

Approximately twenty minutes later, Cutillo and Nunez received another radio communication of yet another disturbance at Zeke's, and they returned to the lounge. Upon their arrival the officers observed a large crowd outside which included the four defendants who, because of their neat attire, "stuck out like a sore thumb." In response to Cutillo's question whether "there had been any problem with the four defendants," Zalenda said "no." Zalenda further stated that "they were friends of his" and that everything was "fine." As the two officers began to disperse the crowd, Cutillo observed the four defendants and Zalenda go around the corner out of his view. About five minutes later, Zalenda returned, bleeding from the left ear. Cutillo asked Zalenda what had occurred. Zalenda denied that the defendants had struck him and denied that the defendants had guns. As Detective Cutillo was leaving the scene, after having dispersed the crowd and after the defendants had left, he heard a female voice yell, "they got guns." From another person in the crowd the officers learned that one of the four defendants was the injured woman's brother-in-law.

Deciding that it would be important to determine whether the four defendants in fact possessed guns and whether they were looking for Simone's assailant, Detectives Cutillo and Nunez began to drive around searching for the defendants. After driving around the area for a few minutes, Cutillo observed a 1980 Lincoln Continental travelling in a direction away from the Lounge. That

vehicle was proceeding at a moderate rate of speed south on Ocean Avenue and was not engaged in any activity which would have alerted Cutillo's suspicions. Despite that, Cutillo began to follow that vehicle, "guessing" that the four defendants were riding in it. Cutillo then radioed ahead to alert another police vehicle. Cutillo directed the other officers to follow the Lincoln and to put on the blue flashing lights when both of their vehicles were behind the Lincoln. When Cutillo's vehicle and the other police vehicle were appropriately positioned, the operator of the other police vehicle turned on the flashing lights, and as the Lincoln pulled over it was cut off by Cutillo's vehicle. As Cutillo was passing the Lincoln he recognized the four defendants. Detective Cutillo had previously learned from a radio communication from the other police vehicle that four persons were in the Lincoln.[2] Just before Detective Cutillo pulled over in front of the Lincoln, he observed that the driver was one of the four suspects and that a person sitting in the front passenger seat leaned forward as if to place something under the front seat.

As the four defendants left the Lincoln, leaving the front and rear doors open, Cutillo and his partner approached them with drawn guns and ordered them to raise their hands. Cutillo pat-searched the defendants and found nothing. He then looked into the front seat of the Lincoln and observed the butt of a pistol sticking out from under the front seat and retrieved it. Nunez then searched under the front seat from the rear and seized another pistol.

At the time he arrested the defendants, Detective Cutillo testified that he feared for his own personal safety, and the judge found his testimony credible. Cutillo testified further that he stopped the Lincoln to determine if the four men were the same men who were at Zeke's Lounge, and to determine if they had guns and whether they were looking for Simone's assailant.

---

[2] Although neither side challenges this finding, it does not appear to be supported by the evidence.

Based on these findings the judge determined that the detectives' reason for pulling over the defendants' car was because it was "the first car they *guessed* [emphasis supplied] the defendants might be riding in."[3] Notwithstanding the judge's finding that the totality of the circumstances "may arguably have provided the detectives with the quantum of articulable suspicion necessary to support an investigatory stop of the defendants,"[4] the judge concluded that, since "the Detectives [had] observed nothing suspicious about either the car or its occupants . . . [and since] there [was nothing] peculiar about the car and its direction of travel which would tie it to what happened at Zeke's," the detectives' action in stopping the car was essentially random and unsubstantiated by any reasonable suspicion that the car indeed contained the defendants.

Apart from the unsettling determination that the stop was not "in any way connected to the event at Zeke's," there is a more significant problem with the findings. There was testimony that Detective Cutillo, simultaneously with hearing that "they got guns," observed a Lincoln turn the corner of Shirley Avenue and approach his location at the corner of Garfield Avenue. Cutillo made this observation *prior* to entering his vehicle. Cutillo and his partner initially drove off in the direction the four men had taken on foot with Zalenda and, not finding them still in that general area, decided to follow the Lincoln previously sighted in order to ascertain whether it contained the four men.

---

[3] The judge also stated that "the decision to pull over the Lincoln Continental was based solely upon a guess, i.e., a hunch . . . not connected in any way to the event at Zeke's."

[4] The judge's full statement was: "The Detectives' suspicion that the defendants had assaulted Mr. Zalenda, a fact which Mr. Zalenda himself denied, coupled with the assumption that an unidentified female was referring to the defendants when she said 'they got guns,' and the uncorroborated assertion of someone in the crowd outside of Zeke's that one of the defendants was related to Ms. Simone may arguably have provided the detectives with the quantum of articulable suspicion necessary to support an investigatory stop of the defendants. See [*United States* v. *Cortez*, 449 U.S. 411, 418 (1981)] (Police entitled to draw inferences and make deductions about 'modes . . . of operation[ ] of certain kinds of lawbreakers')."

The judge found that, after hearing the shout "they got guns" the detectives "began to drive around searching for the defendants [and] after driving around . . . for a few minutes . . . observed a . . . Lincoln . . . travelling in a direction away from the lounge." That finding, however, is contextually and chronologically deficient. Cutillo never testified nor did the judge find that the *first* time Cutillo observed the Lincoln was after he and his partner began to drive around searching for the defendants.[5] Thus, Cutillo's testimony that he had first observed the Lincoln while standing on the corner of Garfield Avenue stood uncontradicted.[6] The judge should have made a specific finding indicating his belief or disbelief of the testimony. The confusion caused by this deficiency is compounded by the judge's conclusion that there was nothing "peculiar about the car and its direction of travel which would tie it to what happened at Zekes." Certainly, sighting the Lincoln coming from the direction which the four men and Zalenda had taken on foot, viewed in the context of a simultaneous shout — "They got guns" — and a subsequent check of the area to make sure the four men were not still on foot, could reasonably be said to warrant Detective Cutillo's "guess" that the car probably contained the four men and should, therefore, be followed.[7] It is to be noted that, prior to the point at which a stop can be said to have begun, see *Commonwealth*

[5]There is testimony in the transcript which, if viewed uncritically, might seem to indicate when Officer Cutillo first saw the Lincoln. However, these instances relate to when Officer Cutillo first observed the Lincoln *after* taking off in the unmarked cruiser, first, to determine if the four men were still on foot and, second, to follow the Lincoln should the four men not be found.

[6]Moreover, nearly all of that testimony was elicited on cross-examination by counsel for defendants Carrozza and Simone.

[7]The choice of the word — guess — is not dispositive. The task for the court is to determine the underlying basis of the officer's decision. A mere "hunch" is constitutionally invalid, but reasonable "inferences" and rational deductions therefrom may yield a "particularized suspicion" in the total circumstances. See *Commonwealth* v. *Egan,* 12 Mass. App. Ct. 658, 660 (1981). See also *Commonwealth* v. *Silva,* 366 Mass. 402, 405-407 (1974).

v. *Thibeau,* 384 Mass. at 764, Cutillo learned, as the judge found, that the Lincoln did contain four men.[8] These facts warranted the police officer's inference[9] that the Lincoln contained *the* four men whom the judge found were "arguably" the reasonable objects of a *Terry*-type[10] stop and frisk.

Finally, taking into account Detective Cutillo's experience, it seems highly (we would hope) unlikely that he or any other police officer would have begun stopping cars at random in order to find the four men eventually. The stop here would plainly have been justified if the officer, by his first observation, indeed had connected the Lincoln in time

---

[8] Notwithstanding the lack of specific evidence on the point, the Commonwealth, the defendants, and the judge all seem to accept it as an established fact. See note 2, *supra.* On remand, this factor, if established, must be evaluated by the judge and included in the calculus of determining reasonable police conduct in the circumstances.

[9] The word used to characterize this inference, by Detective Cutillo himself, was "guess" or "assumption." However, mere use of these words should not control if Detective Cutillo's admitted guess or assumption was in context a reasonable inference to be drawn from specific and articulable facts. In addition, in all but one of the instances when Detective Cutillo admitted he was guessing or assuming, those very words were the only choices presented to him for the purpose of characterizing the basis for his singling out the Lincoln for investigation. The one instance when another choice was given to him was when the motion judge asked: "Did you follow [the Lincoln] as a consequence of recognizing the four men who are the defendants being in that car at that time? Or did you just guess that they were in it?" Whereupon Detective Cutillo responded: "Again, your Honor, I'd have to say I guessed they were." (The word "again," referred to previous testimony by Detective Cutillo that he had assumed the four men had come to Zeke's in a car.) The problem with relying on Detective Cutillo's use of the word "guess" here is that the choice to which he was responding was deficient. Furthermore, given the judge's finding that it was reasonable for Detective Cutillo to suspect the four men had committed a crime at Zeke's [i.e., the assault of Zalenda], the officer's inference that the suspects would make their getaway in a vehicle and along a likely route can also be said to be reasonable. See and compare *Commonwealth* v. *Johnson,* 6 Mass. App. Ct. 944, 945-946 (1978); *Commonwealth* v. *Tosi,* 14 Mass. App. Ct. 1029, 1029-1030 (1982).

[10] See *Terry* v. *Ohio,* 392 U.S. 1, 16-19 (1968).

and proximity with criminal activity which may have oc-curred,[11] was likely occurring,[12] or which might occur.[13]

In view of the foregoing, the motion judge must make ad-ditional findings. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[11] The judge found that, despite Zalenda's denial (see *Almeida, supra* at 268), the officers might reasonably have suspected that the four men had assaulted him.

[12] The judge found that the officers might reasonably have suspected that the defendants were armed. The exigencies of the circumstances would seem to justify the officers' reliance on the shout that "they got guns." For cases dealing with the adequacy of uncorroborated anony-mous tips, see, e.g., *Commonwealth* v. *Anderson*, 366 Mass. 394, 397-400 (1974). "Here the law coincides with the necessities of police investiga-tion, for it would make no sense to leave an officer wringing his hands awaiting full confirmation while a car under such a cloud sped away." *Commonwealth* v. *Cosme*, 15 Mass. App. Ct. 448, 452-453 (1983). In addition, police officers are always warranted in presuming that a person armed does not have a license to carry a firearm and is, therefore, com-mitting a crime. *Commonwealth* v. *Ferrioli*, 10 Mass. App. Ct. 489, 492 (1980), citing *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977).

[13] Given Detective Cutillo's right to proceed based upon his suspicion that the four men were armed, it could be said that his concern over the "safety of others" reasonably justified his decision to investigate. *Com-monwealth* v. *Almeida, supra* at 271. Language quoted in the *Almeida* case from *Adams* v. *Williams*, 407 U.S. 143, 145 (1972), is particularly apt here: "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to ar-rest to simply shrug his shoulders and allow a crime to occur. . . ." *Com-monwealth* v. *Almeida, supra* at 271 n.2.