COMMONWEALTH *vs.* JEFFREY J. BLAKE & another.[1]

Worcester. November 19, 1986. — February 2, 1987.

Present: KASS, KAPLAN, & FINE, JJ.

*Search and Seizure,* Threshold police inquiry, Automobile. *Constitutional Law,* Search and seizure.

Where a police officer had received information from an informant that two men would be selling cocaine in a certain area from an older model yellow Pontiac LeMans automobile in poor condition; that in the vehicle, besides cocaine and coffee creamer used to "cut" the drug, there would be a scale in a green plastic container in the glove compartment; and that the informant had seen the two men selling cocaine from the automobile within the past twenty-four hours, the police conduct in stopping a vehicle matching the description, blocking it with their police cruisers, approaching it on foot without drawing their weapons, asking for the driver's license and automobile registration constituted an investigatory stop governed by the principles articulated in *Terry* v. *Ohio,* 392 U.S. 1 (1968), and upon the driver's opening the glove compartment which revealed a green plastic scale in plain view, on which a white powder was observed, the police were then justified in arresting the vehicle's occupants and seizing the material evidence in the vehicle. [459-462]

Police officers who had stopped an automobile on the basis of information from an informant that two men would be selling cocaine from the vehicle and that a scale in a green plastic container would be found in the glove compartment were not barred from asking the driver of the vehicle for his automobile registration merely because such a request might lead to the suspect's opening the glove compartment, thus revealing evidence of a crime. [462-463]

The seizure of a scale in "plain view" in the glove compartment of a legally stopped vehicle, after the compartment had been opened by the driver in response to a request by a police officer for the vehicle's registration, was not tainted by the fact that the officer, on the basis of information obtained from an informant, suspected the scale might be found in the compartment. [463-464]

[1] John B. Learnard.

INDICTMENTS found and returned in the Superior Court Department on May 13, 1985.

A pretrial motion to suppress evidence was heard by *William W. Simons,* J.

An application for an interlocutory appeal was allowed in the Supreme Judicial Court for the county of Suffolk by *Francis P. O'Connor,* J., and the appeal was reported by him to the Appeals Court.

*Andrew Silverman,* Committee for Public Counsel Services, for John B. Learnard.

*Robert M. Bailey,* for Jeffrey J. Blake, submitted a brief.

*John J. Conte,* District Attorney, *& Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth, submitted a brief.

KAPLAN, J. Having been indicted for the unlawful possession of cocaine (G. L. c. 94C, § 34), the defendants, Blake and Learnard, moved pretrial to suppress material evidence — cocaine, Coffeemate (a coffee creamer), and a gram scale of a type adapted to drug traffic — that had been seized in consequence of what the police intended to be a threshold inquiry. A judge of the Superior Court allowed the motion. A single justice of the Supreme Judicial Court granted the Commonwealth leave to appeal and transferred the appeal to this court. We reverse the suppression order.

In reconstructing the event, we supplement the judge's findings of fact with more detailed references to the testimony of the sole witnesses at the hearing, three State troopers called by the Commonwealth. On November 27, 1984, at 5:00 P.M., Trooper Jeffrey Stone, assigned to a State police narcotics unit in Worcester, met at Leominster with a confidential informant with whom he had had conversations that week. The informant told Stone that one Jeffrey Blake (mentioned during the week as a drug seller), with another man called "Brad," would be selling cocaine in the Whalom Lake area of Lunenburg around 7:30 P.M. that evening;[2] they would be dealing the cocaine

---

[2] This area includes, besides the lake, a large parking space overlooking the lake, an amusement park, and a number of bars and restaurants. Trooper Stone said the parking lot was frequented by drug users and was the site of narcotics arrests.

(i.e. weighing, packaging, and selling it) from an older model yellow Pontiac LeMans in poor condition; in the car besides cocaine and coffee creamer (used to "cut" the drug), there would be a scale in a green plastic container located in the glove compartment. The informant said he had seen Blake and Brad dealing cocaine out of the car within the past twenty-four hours.

Trooper Stone promptly telephoned Corporal Richard Rand, his superior, in Worcester, and passed on the tip; Rand in turn spoke to Trooper Ronald Ford. Rand and Ford, in civilian clothes, drove in an unmarked cruiser to Leominster and met with Trooper Stone about 5:45 P.M. (Apparently the informant was present in Stone's car.) Rand and Ford drove to the Leominster barracks and spoke with a Sergeant Bradley. About 6:10 or 6:15, Rand and Ford set out on a "moving surveillance" of the Whalom Lake area; Bradley, uniformed, in a marked cruiser, also began a patrol.

Around 6:25 P.M., about a mile from the lake area, Rand and Ford observed a Pontiac matching the informant's description headed toward the lake on Route 13. They followed the car and while doing so called in the license number. As the Pontiac pulled into a parking area of a shopping place some 300 yards from the border of the lake area, radio reported that this car was registered to Jeffrey Blake. Rand parked the cruiser in a lot up the street from the shopping place.

One of two men in the Pontiac was seen leaving and walking into a package liquor store. Rand and Ford undertook to wait until the man returned to the car, observe the car's direction, and stop it and ascertain the occupants' identities. Within a few minutes the man, carrying a package, returned to the Pontiac. The driver backed the car and began to move it out of the lot. Rand instantly radioed to Sergeant Bradley, who was parked nearby. The Pontiac was entering a street headed toward Whalom Lake. Bradley turned on his flashing lights and pulled his cruiser diagonally across the path of the Pontiac and several feet ahead of it; Rand put his car three to four feet back of it.

Rand and Ford got out of their car and approached the Pontiac without drawing their weapons. Rand went to the driver's

side of the Pontiac, identified himself, and asked for driver's license and registration. The driver produced a license out of his wallet. Rand took and glanced at the license (it bore the name Blake). Blake reached across the man in the passenger seat (later found to be Learnard) and opened the glove compartment. Standing at the passenger side of the car, Ford saw a green plastic object in the compartment sitting on top of some papers. From his experience, Ford knew the object to be a one-piece scale of the type commonly used in drug transactions.[3] Ford opened the passenger door and took the scale; opening it to working position, he found white powder on it. The officers asked Blake and Learnard to get out of the car. After frisking Learnard (Blake presumably was also frisked, though he is not mentioned), Ford searched the passenger area of the car and found a jar of Coffeemate. On the driver's side, under the rug between the seat and the console, he found a jar of white powder, later determined to be 2.22 grams of 16% pure cocaine. Blake and Learnard were arrested on the spot and taken to the Leominster police barracks.

As noted, the foregoing statement agrees with the judge's finding of fact. On appellate review, we may reexamine the judge's legal conclusions upon the facts, and especially so as constitutional issues are implicit. See *Commonwealth* v. *Watkins,* 375 Mass. 472, 476 (1978); *Commonwealth* v. *Cosme,* 15 Mass. App. Ct. 448, 451 (1983).

1. The defendants do not dispute that the police were entitled to stop the yellow Pontiac. A detailed tip, confirmed by the appearance of the car as predicted, at roughly the indicated place, moving in the "right" direction, surely provided the reasonable and articulable suspicion that justified a threshold inquiry (a *"Terry*-type"[4] stop). See *Commonwealth* v. *Riggins,* 366 Mass. 81, 86-87 (1974); *Commonwealth* v. *Cosme,* 15 Mass. App. Ct. at 452.

---

[3] During his seven-year career, Ford had seen dozens of such green or black plastic scales and had seized many of them. He recognized the object in the car at sight.

[4] *Terry* v. *Ohio,* 392 U.S. 1 (1968).

(a) The defendants follow the judge in arguing that blocking of the car in the given circumstance went beyond a permissible threshold encounter and was tantamount to an arrest.

Any car stop intrudes on a person's privacy and freedom; the intrusiveness permitted, "including considerations of time, space, and force," is that which is "proportional to the degree of suspicion that prompted the instrusion." *Commonwealth* v. *Borges,* 395 Mass. 788, 794 (1985). Although perhaps unnecessary to decision of the present case, we point out that the "suspicion" reasonably generated in the present case was substantial, rising almost, if not quite, to the probable cause that would support an arrest.[5] In fact the conduct of the police was moderate, not drastic or extravagant.

There is argument that immobilizing the car was illegal when the police had no specific proof (aside from general knowledge of the proclivities of drug pushers) that the defendants were dangerous, and had not actually observed any untoward behavior on their part. The police, according to the argument, could not justify doing more than signalling the car to stop. We think the police could act on a probability that the occupants of the car, conscious of guilt and fearing imminent exposure, would, unless blocked, attempt flight, with danger to the public, the police racing in pursuit, and the occupants themselves. Examples of these dangers appear in the cases. See *Common-*

---

[5] Indeed the judge thought that level was attained, but the arrest failed because exigent circumstances did not exist. We need not attempt to justify the police tactics as an arrest, although a case may be made to this effect within the *Aguilar-Spinelli* doctrine (*Aguilar* v. *Texas,* 378 U.S. 108 [1964]; *Spinelli* v. *United States,* 393 U.S. 410 [1969]) applied in our courts. See *Commonwealth* v. *Upton,* 394 Mass. 363, 374-376 (1985). The informant said he had seen Blake and Brad in action within the day, and he provided details which were verified by records and by observations that preceded the stop. Trooper Stone said he had dealt with the informant for a week; in that period there were no consequent arrests, but it was indicated that the police had checked some, at least, of the informant's information. However, we are not told how the informant came to know that Blake and Brad would be dealing that night.

If probable cause was shown, exigent circumstances could be found — contrary to the judge's view — in the mobility of the car and the short interval of time between the tip and the observations in which to make any attempt to secure a warrant.

*wealth* v. *Fitzgibbons, ante* 301, 305-306 (1986); *United States* v. *Harley,* 682 F.2d 398, 401-402 (2d Cir. 1982); *Commonwealth* v. *Jones,* 759 F.2d. 633, 638 (8th Cir.), cert. denied sub nom. *Jones* v. *United States,* 474 U.S. 837 (1985).

The stop, then, was not disproportionate; and, in approaching the car on foot and commencing the inquiry, the police officers behaved without show of force. The blocking of the car was not itself incompatible with a *Terry* inquiry or equivalent to an arrest. See *Commonwealth* v. *Riggins,* 366 Mass. at 86-87; *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984); *Commonwealth* v. *Moschella,* 11 Mass. App. Ct. 1021, 1022 (1981); *Commonwealth* v. *Reed, ante* 294, 296 (1986); *Commonwealth* v. *Fitzgibbons, supra* at 306; *United States* v. *Vargas,* 633 F.2d 891, 896 (1st Cir. 1980); *United States* v. *Marin,* 669 F.2d 73, 81 (2d Cir. 1982); *United States* v. *Jones,* 759 F.2d at 638; *United States* v. *Streifel,* 781 F.2d 953, 961 n.15 (1st Cir. 1986), appeal after remand sub nom. *United States* v. *Quinn,* 815 F.2d 153, 156-159 (1st Cir. 1986). No later action by the police rendered the encounter illegal.

The present case is in distinct contrast to *Commonwealth* v. *Bottari,* 395 Mass. 777 (1985), cited by the judge, where an illegal arrest was found.[6] In that case the police had an anonymous informant's tip that the defendant carried a handgun and might be located at a certain parking lot. Police went to the lot and kept his car under observation. As the defendant and others entered the stationary car, the police blocked the car and approached it with drawn guns and ordered the men out with their hands to the top of the car and frisked them. Thereafter they asked the driver for his registration and searched the car and found weapons. There were findings that the officers at the time were not in fear for their own or others' safety.

The judge below appears to have read *Bottari* as establishing a fixed rule that blocking a car is the equivalent of an arrest: "The fact," he said, "that the defendants were not stopped at

---

[6] *Commonwealth* v. *Fitzgibbons, supra* at 303, shows that the *Bottari* case does not represent a departure from accepted State and Federal precedent in *Terry* stops of motor vehicles.

gun point here as were the occupants in the vehicle in *Bottari* is not distinguishing in this regard." This is a misreading of *Bottari*. It was blocking (of a standing car), taken together with display of weapons, and ordering occupants out with hands up and frisking them before request for identification, all in a context where fear was not felt, that amounted to arrest. The actions of the police were disproportionate to the nature of the suspicion that warranted the instrusion and to the circumstances, thus an arrest without probable cause, and illegal. In our case there was no arrest, rather a *Terry* stop, until the discovery of the scale which then resulted in and justified the arrests. Besides *Bottari,* the defendants cite *United States* v. *Beck,* 598 F.2d 497 (9th Cir. 1979). This like *Bottari* was an instance where blocking was only a prelude to escalating force, signaling arrest.[7] The same holds for *Commonwealth* v. *Sanderson,* 398 Mass. 761, 764-767 (1986).[8]

(b) The defendants — but not the judge — argue, further, that as the police had reason to think there might be a scale in the glove compartment, they were barred from asking for the registration paper, since the scale might also be found there: to make a request that could lead to the suspect's opening the compartment was, they say, an indirect way of conducting an unlawful search, the compartment being a place of privacy, see *Commonwealth* v. *Podgurski,* 386 Mass. 385, 389, cert. denied, 459 U.S. 1222 (1982). The argument is little short of quixotic. A request for license and registration is routine and permissible in a threshold stop of a motor vehicle, whether

---

[7] *Commonwealth* v. *Borges,* 395 Mass. 788 (1985) (decided the same day as *Bottari*), is also cited. It is a case of egregious police action, unrelated to blocking of a car, in which the court stresses the idea of proportionality.

[8] We note, finally, the defendants' suggestion that the police might have approached Blake on foot as he sat in the car. This would not necessarily have obviated (it might have encouraged) an attempt by Blake to drive off; and it might have lost Learnard. That this approach might conceivably have been used, and been legal, is quite consistent with the legality of the variant approach that was in fact used. We are to review the situation "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States* v. *Hall,* 525 F.2d 857, 859 (D.C. Cir. 1976).

ownership of the vehicle does, or does not, have a possible relation to the suspected criminal activity; examples of the latter situation are *Commonwealth* v. *LaBossiere,* 347 Mass. 384, 386 (1964), *Commonwealth* v. *King,* 389 Mass. 233, 236 (1983), and *Commonwealth* v. *Wren,* 391 Mass. at 707. The response to a request for "papers" serves to indicate how the person is oriented or disposed, whether the police should be on further inquiry — natural aims of a police stop — and the average motorist accepts the routine question, if grudgingly, because he is aware that the law for good reason requires instant availablity of these documents (see G. L. c. 90, § 11).[9] That the troopers knew the official record had the Pontiac registered to Blake did not necessarily make the inquiry redundant and did not assure that a registration would be forthcoming or, if produced, would tally with the record. There was no assurance that the registration, if present, would be drawn out of the glove compartment: it might as well come out of a wallet; indeed, one might expect a malefactor to anticipate a request for the registration and take pains not to place it with a telltale scale in the glove compartment. Beyond all this, we think it approaches paradox to suggest that a routine request, not in itself unduly intrusive, must be deliberately censored because it could lead to evidence of crime.

2. With the compartment opened, the scale was in "plain view" and subject to seizure. See *Commonwealth* v. *Accaputo,* 380 Mass. 435, 447 (1980); *Commonwealth* v. *Irwin,* 391 Mass. 765, 771 (1984); *Commonwealth* v. *Cosme,* 15 Mass. App. Ct. at 453. But it is argued that the plain-view doctrine applies only to things come upon by the police inadvertently or accidentally, whereas here the police had some reason to suspect that a scale might be present. What properly is meant by inadvertent was expounded by the court in *Commonwealth* v. *Cefalo,* 381 Mass. 319, 331 & n.9 (1980), and the analysis need not be repeated here. That Trooper Ford suspected a scale

---

[9] If the person produces license and registration and nothing unusual appears, he must of course be allowed to go on his way. See *Commonwealth* v. *Loughlin,* 385 Mass. 60, 62 (1982); *Commonwealth* v. *King,* 389 Mass. at 244. Compare *Commonwealth* v. *Sanderson,* 398 Mass. at 765 n.7.

might be found in a particular enlosure in the car did not taint his sighting it from a lawful position outside the car when the enclosure was opened by another hand.

*Suppression order reversed.*