Welch, J.
The defendant, who was arrested in Lawrence, Massachusetts on October 18, 2002 and found to be in possession of 40 grams of cocaine, along with a bag of marijuana, moves to suppress this evidence. This case presents the frequent and thorny divide between a good police hunch and reasonable suspicion. Judging this matter is admittedly a close call. But, with the luxuiy of hindsight, this judge concludes that the motion must be granted.
FACTUAL FINDINGS
As is true in all such cases, the facts are what determine whether there was a reasonable suspicion to stop a taxi cab in Lawrence, Massachusetts on the night of October 18, 2002.
This drug investigation began on October 16, 2002 when an extremely experienced detective, Detective Brian Burokas, of the Lawrence Police Department, received information from a reliable informant. Detective Burokas knew the identity of this informant and had received information from this informant on four different occasions in the year 2001. All of this information had turned out to be reliable in that the informant provided information which had led to controlled drug buys, the execution of search warrants that produced stashes of illegal drugs, arrests and various drug seizures. Based on this track record, there is little doubt that the informant could be deemed reliable.
On October 16, 2002, the informant told Detective Burokas that an individual by the name of Ender Carrion was dealing drugs from the location of 62 Kent Street in Lawrence, Massachusetts. He did not describe Mr. Carrion nor did he explain the basis for his allegation of drug dealing. 62 Kent Street is an apartment building (containing 4-6 apartments) which contains one entrance in the front of the building. The informant told the detective the complete license plate number of Ender Carrion’s car and described the car as a white BMW. He also told the detective the license plate was issued by the state of New Hampshire. On the 16th, Detective Burokas confirmed this information by driving by 62 Kent Street, observing the white BMW with the exact New Hampshire license plate provided, and running that plate and confirming that the vehicle belonged to an Ender Carrion.
Two days later, October 18, 2002, Detective Burokas was again contacted by the reliable informant. The informant informed Detective Burokas that approximately 9:00 p.m. that evening a yellow cab would be coming to 62 Kent Street to pick a person up who would be carrying drugs and that person would be driven to a location off Brook Street in Lawrence to drop those drugs off. Brook Street is a fair distance away from Kent Street in Lawrence, Massachusetts and is a relatively short street. The Brook Street area is an area of moderate crime activity. In the past decade, numerous drug arrests occurred on Brook Street, although in more recent years the amount of illegal drug activity has moderated.
Upon receiving this information, Detective Burokas, with the assistance of Captain Patrella of the Lawrence Police Department, quickly set up a surveillance of 62 Kent Street. This surveillance was accomplished by the two officers sitting in an unmarked car approximately 60 to 70 feet away from the front door of 62 Kent Street. At approximately 9:00 p.m. on the evening of October 18, 2002, just as the reliable *229 informant had stated, someone driving a yellow taxi cab pulled up to the front of 62 Kent Street, turned around, and beeped its horn. Detective Burokas and Captain Patrella observed the front door of 62 Kent Street being opened. Once the front door opened, the two officers saw that the door of the first floor left side apartment was also open. Two Hispanic males stood within the entry way. One of these Hispanic males (the defendant) then exited the building and got into the back seat of the taxi cab. The cab headed in the direction of Brook Street. The unmarked police car followed the taxi cab and noted that it went directly to Brook Street. Once on Brook Street, just as the reliable informant had stated, the taxi cab turned off Brook Street onto a side street named Milford Street. As soon as this occurred, Detective Burokas (who operating the unmarked cruiser) activated the blue lights on the cruiser and stopped the taxi cab. By this point, Detective Burokas already had requested two other police detectives (a Detective Paul Platamurra and his partner) to provide assistance. Detective Platamurra followed the unmarked cruiser being operated by Detective Burokas to the Brook and Milford Street intersection.
The cab promptly stopped and Detective Burokas approached the cab on the driver’s side. He used a flashlight to illuminate the interior of the cab. Detective Burokas noticed the defendant sitting in the back seat (on the driver’s side) of the cab. Detective Burokas also noticed that the defendant’s left hand, and perhaps his right hand, was positioned behind his back and the defendant was making movements with this left hand as if to stuff something into the opening between the rear seat and the seat back.
Once Detective Burokas observed this behavior, he opened the taxi cab door and pulled the defendant out of the cab. Detective Burokas, at that point, had concerns for his safety because he was unsure whether the defendant was attempting to secret a weapon. At the time Detective Burokas pulled the defendant out of the cab, Detective Plantamurra was standing very close to Detective Burokas. Detective Plantamurra also observed the same actions of the defendant, i.e., placing his hands behind his back attempting to shove something between the back seat of the taxi cab and the back rest. Plantamurra had noticed a rolled up grey t-shirt protruding from the defendant’s back pants pocket. Plantamurra observed that this was the object that the defendant had unsuccessfully attempted to place between the seat and seat back of the taxi cab.
Detective Plantamurra immediately removed the rolled up t-shirt from the defendant’s pants pocket once the defendant was taken from the back seat of the taxi cab. Detective Plantamurra felt the rolled up t-shirt by patting it. From this touching he determined that there was no hard object containing within the rolled t-shirt. Instead, it felt, in his words, “squishy” as if it contained some sort of “substance.” Upon making this determination, Detective Plantamurra immediately opened the t-shirt and found that contained a quantity of what appeared to be powdered cocaine.
The defendant, then, was immediately placed under arrest and handcuffed. Detective Burokas read the defendant his Miranda rights by reading off a card that he carried. After the defendant’s Miranda rights were read to him, Detective Burokas asked the defendant if he had any other drugs. The defendant acknowledged that he did have some more drugs within one of his socks. A further search revealed a quantity of marijuana in one of the defendant’s socks.
LEGAL ANALYSIS Protective/Weapon Search
One legal issue can be disposed of easily. The seizure of the cocaine cannot be justified as a legitimate protective search or search for weapons. Even though the police initially had legitimate concerns for their, safety when they observed the defendant hide something behind his back, those concerns only justify a pat frisk of the defendant or the rolled up grey t-shirt. Detective Plantamurra performed such a pat frisk of the t-shirt and found that it did not contain any type of object that could be considered a dangerous weapon. Instead of anything hard being within the rolled up t-shirt, Detective Plantamurra noted that the object was “squishy" and that he had suspected that there was some sort of “substance” within the rolled up t-shirt. Once the defendant had been removed from the cab and the object in his back pocket determined not to be a weapon, there was no further justification (absent probable cause) to search the rolled up t-shirt. See Commonwealth v. Pagan, 404 Mass. 62, 72 (2003) (“For many, perhaps most, containers made of soft material, a pat frisk will provide additional information either supporting or eliminating the officer’s reasonable suspicion that a weapon be hidden within”).
The Initial Stop
The facts in this case present a very close issue as to whether the initial stop was justified. Indeed, this case illuminates the tension between such holdings by the Supreme Judicial Court as Commonwealth v. Lyons, 409 Mass. 16 (1990), and Commonwealth v. Va Meng Joe, 425 Mass. 99 (1997). These two holdings, and various other cases following those precedents, require a trial judgenever mind a police officerto navigate rather treacherous shoals.
One starts with the basics. The stop, of course, must meet the reasonable suspicion standard and such suspicion must be “based on specific, articulable facts and inferences therefrom,” rather than speculation or a “hunch.” Commonwealth v. Wren, 391 Mass. 705, 707 (1984). In this Commonwealth, a judge evaluates the reliability or veracity of the tip and the informant’s basis of knowledge. This is the two-prong Aguilar-Spinelli analysis retained in the Common *230 wealth. As is well established, “independent police corroboration may make up for deficiencies in or both of these factors.” Because the standard is reasonable suspicion for a stop rather than probable cause “a less vigorous showing in each of these areas is permissible.” Commonwealth v. Lyons, 409 Mass. 16, 19 (1990). See Commonwealth v. Alvardo, 423 Mass. 266, 268-69 (1996). This is an objective standard that takes into account the events as they progress. The process has been likened to a silent movie being played before the eyes of a reasonable and experienced police officer.
The Supreme Judicial Court held in the Lyons case that this reasonable suspicion standard had not been met when the police received information from an anonymous informant indicating that “two white males, one whom would be named Wayne, just purchased narcotics in Chelsea and were heading for Brighton, Maine. The caller said that they would be driving a silver Hyundai automobile with Maine registration 440-44T.” Id. at 17. The anonymous informant also provided this information shortly after 1:00 a.m. The State Police staked out Route 95 Northbound (a principal route between Chelsea and Maine) near Newbuiyport, Massachusetts and, sure enough, 45 minutes later (the approximate amount of time it would take to get from Chelsea to Newbuiyport), the officers saw two white males in a silver Hyundai automobile with the Maine Registration plate number heading north. To the surprise of dissenting Justice Nolan, the Supreme Judicial Court found that this information from an anonymous informant did not meet the reasonable suspicion standard because the “quantity and quality of the details corroborated by the police were simply insufficient to establish any degree of suspicion that could be deemed reasonable.” The Court held that the corroboration went only to “obvious details, not non-obvious details” and noted that the defendants did not display any suspicious behavior that might have heightened police concern.
In the present case, the informant was not anonymous, instead his identity was known to Detective Burokas and the informant already had an established track record of reliability. Nevertheless, his tip did not provide any basis of knowledge (for example, the informant did not indicate that he had purchased any drugs from the Kent Street location) nor did the tip provide any more detail than the tip in the Lyons case. One could argue that this tip was less detailed. In Lyons the informant predicted the time and route of travel of the vehicle (just as in this case) but also provided the exact vehicle that the parties would be traveling and identified one party by name and the race of the occupants of the car. This type of detail is lacking in the present case. Although the events did unfold precisely the way in which the reliable informant predicted, all of the detail provided by the reliable informant related to what the Supreme Judicial Court has termed “obvious details” of innocent behavior (i.e., being picked up by a taxi cab and being taken from one location to another) and did not contain any suspicious behavior before the stop. Thus, one might conclude, the stop in the present case was invalid based upon the Lyons precedent.
But, as with many things in the law, the answer is not that obvious. The reason is that one must also look at more recent precedents such as Commonwealth v. Va Meng Joe, 425 Mass. 99 (1997).[1] In that more recent case, a confidential informant (who was not anonymous but did not have a track record of reliability) informed a federal law enforcement official that he had arranged to purchase heroin from the defendant. The informant said that the heroin delivery would take place that specific day outside of a donut shop located on Morton Street in Roxbury. The timing of the delivery was to be within 3:30 and 4:00 p.m. and the informant stated the defendant would deliver the heroin alone in a black Mercedes Benz automobile.
The Boston Police department staked out the donut shop and, sure enough, at approximately 4:00 p.m. the defendant appeared alone in a black Mercedes Benz automobile in front of the donut shop. He pulled in front of the donut shop, slowed down and looked around, but did not come to a complete stop. As he proceeded on, the Boston Police stopped the defendant. The Supreme Judicial Court concluded, on these facts, that “there is no doubt . . . the police had reasonable suspicion to make an investigatory stop.” Id. at 105. See also Commonwealth v. Blake, 23 Mass.App. 456, 459 (1987). The Supreme Judicial Court reasoned that “the police officers corroborated the informant’s predication with respect to the defendant’s future behavior by verifying the defendant’s arrival, alone, at a particular location at a particular time. Corroboration of future behavior, which goes beyond ”readily available information," has a special significance when determining the reliability of an informant." Id. at 104. The present case also involves corroboration of future behavior. Further the informant in this case was not only known to the police but also had a track record of reliability. Thus, one might hastily conclude, there is “no doubt” that reasonable suspicion existed for the stop.
The Va Meng Joe case, however, does present some differences from the present controversy. In that case, the informants tip did provide a basis of knowledge. The informant himself had arranged the heroin sale. Here, the informant’s tip did not provide any basis of knowledge. In addition, the tip in Va Meng Joe was more detailed. The identity of the precise person making the delivery was described. In addition, the precise vehicle to be utilized was provided along with the fact that the defendant would be traveling alone. The tip in the present case is slightly less detailed. For example, the informant did not inform the police who it was who would be making the drug delivery. In other respects, however, the tip is quite similar to the one in Va Meng Joe. The fact that the yellow cab is used as opposed to *231 a black Mercedes cannot be of legal significance. A precise time was predicted and corroborated as was the precise pick up location and relatively precise destination. As the court stated in Va Meng Joe, “the tip contained details of fairly specific information of the type not easily obtainable by a casual bystander such as . . . the vehicle he would be driving, the exact destination, and the approximate time that he would arrive.” Id. at 103. See also Commonwealth v. Bakoian, 412 Mass. 295, 301-02 (1992); Commonwealth v. Anderson, 366 Mass. 394, 399-400 (1974).
Still the basic fact remains that there is an important distinction between the Va Meng Joe line of cases and the present case. That distinction is the fact that the reliable informant in this case provided no basis of knowledge. Corroborating the details provided here (the fact that a taxi cab would be used, the precise time of pick up, the relatively definite destination and the exact location of the pick up) did not help to verify in any way the basis of knowledge prong. The police had no reason to believe (other than the reliable informant’s word which was not based on any known personal experience) that there was any drug dealing at the 62 Kent Street location. Nor was there any suspicious activity (unlike the Va Meng Joe case) which occurred during the surveillance of the vehicle’s travel. Thus, this court concludes that the stop here was not based on reasonable suspicion. Instead, the stop was based on a hunch. Needless to say, this was a good hunch grounded in the extensive experience of a veteran narcotics officer. Difficult as it might be for such a police officer to tread on the side of “reasonable suspicion” verus a “hunch,” this is what the Constitution of this Commonwealth demands. To put it bluntly, the police jumped the gun and made the stop before seeing or confirming any suspicious activity that might indicate drug dealing. Thus, the stop was illegal and any subsequent search must be deemed illegal. The motion must be allowed and the fruits of the search must be suppressed.[2]

 The Lyons case, despite its 14 years of age in a frequently litigated area, is still good law and is frequently citedand often distinguishedin many a SJC case.

 If this court is incorrect in holding that the initial stop was illegal, the Va Meng Joe precedent would uphold the eventual search. This is because the activities taken by the defendant (apparently attempting to hide the item that was eventually seized after the stop) would raise reasonable suspicion to the level of probable cause. Commonwealth v. Va Meng Joe, 425 Mass, at 105-07. The actions of the defendant here were considerably more suspicious than a cab passenger looking back at the following vehicle and moving his shoulders. See Commonwealth v. Hooker, 52 Mass.App. 683, 686-87 (2001) (“A citizen is not required to sit absolutely motionless in a stopped vehicle. Not every turn of the head is a furtive gesture causes a defendant a fate equivalent to that of Lot’s wife.”) (Grasso, J.).